## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EUROFINS PANLABS, INC.,      :
     :
         Plaintiff,      :
     :
       v.      :      **C.A. No. 8431-VCN**
     :
RICERCA BIOSCIENCES, LLC,      :
RICERCA HOLDINGS, INC., and      :
RONALD IAN LENNOX,      :
     :
         Defendants.      :

## MEMORANDUM OPINION

Date Submitted: January 30, 2014
Date Decided: May 30, 2014

Matthew E. Fischer, Esquire, Timothy R. Dudderar, Esquire, and Justin H. Morse, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, and Todd Wind, Esquire, Crystal M. Patterson, Esquire, and Erin M. Secord, Esquire of Fredrikson & Byron, P.A., Minneapolis, Minnesota, Attorneys for Plaintiff.

Gregory V. Varallo, Esquire, Richard P. Rollo, Esquire, and Kevin M. Gallagher, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants.

NOBLE, Vice Chancellor

A judge's objective in reading a contract is usually to glean the parties' shared intent, which may be found in the words of the contract. The Plaintiff claims that its intentions were frustrated by the disingenuousness or fraud of the Defendants. It invokes a variety of representations attributed to the Defendants that were neither accurate nor incorporated into the otherwise detailed contract of these sophisticated parties. A combination of buyer's remorse and "wishing makes it so" may persuade a frustrated and disappointed buyer that only the seller's misrepresentations could have placed the buyer in its unhappy predicament. How far a plaintiff can go with this approach, in the context of resisting a motion to dismiss for failure to state a claim, may be the question before the Court.

## I. INTRODUCTION

The dispute concerns the Stock and Asset Purchase Agreement (the "SAPA")[1] entered into in September 2012, by Plaintiff Eurofins Panlabs, Inc. ("Eurofins") and Defendants Ricerca Biosciences, LLC ("Ricerca") and Ricerca Holdings, Inc. ("RHI"). Eurofins alleges that Ricerca, its Chairman and Chief Executive Officer, Defendant Ronald Ian Lennox ("Lennox"), and RHI (collectively, the "Defendants") made fraudulent statements concerning the business to be sold to Eurofins, a key customer relationship, its pension obligations, and other details. Certain of those false statements are also alleged as

---

[1] Defs.' Opening Br. in Supp. of Their Mot. to Dismiss ("OB"), Ex. A (the SAPA).

1

breaches of contract or asserted under a unilateral mistake theory, and, in addition, Eurofins brings claims under the implied covenant of good faith and fair dealing and for violation of the Delaware Securities Act.

Defendants' effort to obtain dismissal is notable for the prodigious number of arguments they raise. To some extent, perhaps because of briefing constraints, certain arguments are conclusory or avoid portions of Eurofins's Verified Amended Complaint (the "Complaint"). Nonetheless, many of Eurofins's claims are dismissed. Specifically, its claims concerning the assets sold to it under the SAPA and the associated transfer of technical knowledge, its claims concerning the extension of a sublease, its fraud claim concerning the pension plan of Ricerca Taiwan (as defined herein), its unilateral mistake claim involving the transfer of anti-infection models, and its claims arising under the Delaware Securities Act and the implied covenant of good faith and fair dealing are dismissed as to all Defendants. Additionally, all claims against Lennox, aside from those based on the relationship with a key customer, are dismissed. Eurofins's other claims survive.

## II. BACKGROUND

A. *The Parties*

Eurofins is a Delaware corporation with its principal place of business in Bothell, Washington. It is an indirect, wholly-owned subsidiary of Eurofins SE, a

2

publicly traded company incorporated in Luxembourg with its headquarters in Brussels, Belgium. Eurofins SE provides a range of analytical testing services to clients spanning multiple industries. Eurofins was incorporated to enter into the SAPA and to operate the acquired business, which provides early stage drug research services to the pharmaceutical industry.[2]

Ricerca is a Delaware limited liability company with its principal place of business in Concord, Ohio. Ricerca offered drug testing and research services to pharmaceutical companies.[3] RHI is a Delaware corporation and is the sole shareholder of Ricerca Intermediate Holdings, Inc. ("Ricerca Intermediate"), which is the sole member of Ricerca.[4] Lennox was, at all relevant times, an officer or director of Ricerca.

B. *The Events Preceding the SAPA's Execution*

Ricerca's early stage drug research services included molecular pharmacology (how a drug operates at the molecular level) and functional pharmacology (how a drug impacts the function of targeted and other cells).[5] Ricerca performed services in a least four locations: Concord, Ohio; Bothell,

---

[2] Am. Verified Compl. ("Compl.") ¶ 2. Eurofins had no employees and conducted no business before the closing under the SAPA and thus the negotiation and execution of the SAPA, and other related closing actions were undertaken by Eurofins Scientific, Inc., a Delaware corporation and an indirect wholly-owned subsidiary of Eurofins SE. References to the entity "Eurofins" include activities undertaken by Eurofins Scientific, Inc. on behalf of its related entity, Eurofins.

[3] *Id.* ¶ 3.

[4] *Id.* ¶ 4.

[5] *Id.* ¶ 7.

Washington; Taipei, Taiwan; and Lyon, France. In 2012, it began actively marketing certain parts of its business, including its physical assets and business operations in Bothell, Washington and the stock of Ricerca Taiwan, Ltd. ("Ricerca Taiwan"), a wholly-owned subsidiary organized under the laws of Taiwan. The Ricerca Taiwan operation and the Bothell operation are, collectively, the "PHA Division."

Ricerca developed a Confidential Information Memorandum ("CIM") for distribution to potential purchasers of the PHA Division. The CIM's content was drafted by several key Ricerca employees, including Dr. James Baumgartner ("Baumgartner"), Senior Vice President of Pharmacology and a long-time employee of Ricerca; Gerald (Gary) Jacobson ("Jacobson"), Executive Vice President and Chief Financial Officer of Ricerca; and Roger Gasper ("Gasper"), Vice President of Accounting and Finance of Ricerca.[6] Lennox and Jacobson allegedly directed and controlled the CIM's content by, in part, instructing Baumgartner and Gasper as to what should and should not be included in it.[7] Eurofins also contends that Lennox orchestrated Ricerca's and RHI's negotiations with Eurofins, including directing the written and oral communications of other individuals involved in negotiations.[8]

---

[6] *Id.* ¶ 10.
[7] *Id.*
[8] *Id.* ¶ 5.

Eurofins received a version of the CIM and became interested in the possibility of acquiring the PHA Division.[9] On August 10, 2012, Eurofins Scientific, Inc. entered into a Letter of Intent to acquire the PHA Division with the sale price based on information in the CIM.[10] The companies initiated due diligence and on September 18, 2012, Eurofins, Ricerca, and RHI signed the SAPA.[11]

The parties agreed that a portion of the initial payment would be placed in an indemnification escrow, none of which has been released to date.[12] The purchase price under the SAPA consisted of the initial payment and an earn-out based on Eurofins's revenues for the period from September 1, 2012 through December 31, 2012.[13] The earn-out was further subject to adjustments for the closing date value of the pension plan sponsored by Ricerca Taiwan and the closing date working capital of the PHA Division.[14]

The parties closed the transaction on October 1, 2012. Lennox is alleged to have received a portion of the funds from the initial payment as well as a bonus for closing.[15] The parties calculated the post-closing purchase price adjustments,

---

[9] *Id.* ¶ 12.
[10] *Id.* ¶ 13.
[11] *Id.* ¶¶ 14-15.
[12] *Id.* ¶ 17.
[13] Eurofins calculated the total purchase price primarily as a multiple of Ricerca's earnings before interest, taxes, depreciation, and amortization ("EBITDA"). *Id.* ¶ 19.
[14] *Id.* ¶ 18.
[15] *Id.* ¶ 20.

although neither has paid amounts due under them. They agree that nothing is owed under the earn-out because the target revenue projections were not met.[16]

The Complaint recounts certain factual events during negotiations which allegedly resulted in fraudulent statements or breaches of the SAPA, or which otherwise require relief under more exotic theories such as the implied covenant of good faith and fair dealing or the Delaware Securities Act. The background to these claims does not naturally form a linear narrative and thus the Court describes each event before it evaluates the sufficiency of the pleadings on the Defendants' motion to dismiss.

## III. CONTENTIONS

The Complaint contains eight counts. Its first count requests an injunction to cause Defendants to transfer all anti-infection models and certain technical know-how to Eurofins and to stop competing against it. Its second count requests rescission of the SAPA based upon Defendants' misrepresentations and upon the doctrine of unilateral mistake. Counts III and IV assert intentional and negligent misrepresentations, respectively, concerning the models from the Concord facility that Eurofins asserts should have been transferred to it, the loss of a major customer, the Ricerca Taiwan pension plan, and a sublease and certain expenses. In Count V, Eurofins claims Defendants violated the Delaware Securities Act

---

[16] *Id.* ¶ 21.

6

when Ricerca Taiwan's shares were sold by means of untrue statements and omissions of material facts. In Counts VI-VIII, Eurofins alleges breaches of contract and breaches of the implied duty of good faith and fair dealing against Ricerca and RHI for the loss of a major customer, the failure to identify the Concord models in the agreement, competing against Eurofins in violation of the agreement, and the sublease and expenses.

Defendants first argue that all of Eurofins's claims should be dismissed because it failed to comply with certain formalities they claim the SAPA requires. They then proceed to explain why each set of factual circumstances underlying the fraud or breach of contract claims fails to state a claim. Finally, they argue that the Delaware Securities Act should not apply to the sale of Ricerca Taiwan's stock, that the implied covenant of good faith and fair dealing cannot be invoked because the parties' obligations are expressly defined by the SAPA, and that the claims against Lennox should be dismissed.

## IV. ANALYSIS

Defendants have moved under Court of Chancery Rule 12(b)(6) to dismiss all of Eurofins's claims. The Court thus accepts all well-pled facts as true and draws all reasonable inferences in favor of Eurofins.[17] The Court accepts even vague allegations in the Complaint as well-pled if Defendants were provided notice

---

[17] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

7

of the claim.[18] The reasonable conceivability standard, which asks whether there is a possibility of recovery, applies and the Rule 12(b)(6) motion will be denied if Eurofins's well-pled factual allegations would entitle Eurofins to relief under a reasonably conceivable set of circumstances.[19] Nonetheless, the Court need not accept conclusory allegations that are unsupported by specific facts or draw unreasonable inferences in favor of Eurofins.[20]

A. *Did Eurofins Comply with the SAPA's Procedural Requirements?*

Defendants argue that Eurofins failed to provide "reasonable detail" of the "factual basis" for its claims and failed to allege that the $150,000 basket requirement of the SAPA was satisfied in the aggregate or with respect to each individual claim.[21] The Court rejects Defendants' arguments.

The SAPA does not define reasonable notice or explain how the Court should enforce a failure to comply with the provision. The initial notice Eurofins sent to Defendants included a draft copy of its original complaint which appears to

---

[18] *Id.*

[19] *Id.* at 537 & n.13.

[20] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[21] The notice provision requires that the party seeking indemnification provide "reasonable detail" of the "factual basis" for its claim. SAPA § 9.5. After such notice is received, the other party has 45 days to contest the claim, during which time "the Parties shall meet to discuss a reasonable settlement of all claims." *Id.* The provision does not explain the consequences of a failure to follow those instructions. The SAPA's basket and cap provisions provide that Ricerca will have no liability unless and until the aggregate amount of claimed damages exceeds $150,000 and its total liability shall not exceed $3.5 million. *Id.* §§ 9.6(a)-(b).

be substantially similar to its current Complaint.[22] Additionally, Defendants' reply letter to this notice was titled "Notice Contesting Indemnification Claims," indicating they understood the purpose of Eurofins's letter providing notice.[23] The Court concludes the notice complies with the SAPA's requirement.

Defendants also urge the Court to dismiss the Complaint because it does not explicitly state that Eurofins provided notice which complied with the SAPA's notice requirements. Again, no provision in the SAPA requires this result and the Court will not re-write the contract to impose such a requirement.[24]

Next, Defendants contended at oral argument that Eurofins failed to comply with the SAPA's notice provision requiring that the parties "shall meet to discuss a reasonable settlement of all claims" during the 45-day period when a claim can be contested.[25] In a similar situation, one in which the parties to an agreement did not observe a mandated negotiation provision before filing suit,[26] the Court concluded, on a motion to dismiss, that the complaint could not be dismissed because the

---

[22] *See* Pl.'s Br. in Resp. to Defs.' Mot. to Dismiss ("AB"), Ex. B.

[23] AB, Ex. A.

[24] Defendants ask the Court to extend *Norman v. Paco Pharm. Servs., Inc.*, which they claim stands for the proposition that a claim may be dismissed if a party ignores the notice requirements to which it is contractually bound. *Norman v. Paco Pharm. Servs., Inc.*, 15 Del. J. Corp. L. 1091, 1109 (1989). *Norman* is factually distinguishable because actual notice was provided here.

[25] Oral Arg. on Defs.' Mot. to Dismiss, Tr. 7-13; SAPA § 9.5.

[26] *See Anvil Hldg. Corp. v. Iron Acquisition Co., Inc.*, 2013 WL 2249655, at *11-12 (Del. Ch. May 17, 2013).

agreement did not "state that a failure to negotiate would be grounds to dismiss an Indemnified Party's later complaint."[27]  The same result applies here.[28]

Concerning the SAPA's basket threshold, Eurofins supplied Defendants with an estimate of the combined value of its claims at $5.5 million, an amount exceeding the $150,000 basket requirement.[29]  Furthermore, the Complaint alleges that Eurofins overvalued the PHA Division by more than $1 million, which also exceeds the $150,000 basket requirement.  Though Eurofins did not assign a dollar value to each of its claims or represent that their total value will not exceed the SAPA's $3.5 million cap, it need not do so to bring a claim.[30]  The SAPA's terms do not specify pleading requirements and the Court will not independently impose them.

B.  *Did Eurofins Fail to State an Indemnification Claim?*

Defendants next argue that the SAPA only permits a remedy of indemnification, and that the Complaint requests remedies Eurofins agreed to

---

[27] *Id.* at *12.

[28] The *Anvil* court also noted that there was no "overture inviting productive negotiations."  *Id.* at *11.  Eurofins's letter providing notice invited Ricerca to engage in negotiations and therefore makes *Anvil* factually distinguishable.  AB, Ex. B at 1 ("We encourage Ricerca to strongly consider the benefits of resolving this dispute by agreement before the Complaint is filed.  To expedite the process, we propose that a meeting occur among [various relevant parties] to resolve this dispute . . . on March 11, 14, or 15, 2013.  We look forward to hearing from you.").

[29] AB, Ex. B at 1.

[30] Its reward under its indemnification claims, if successful, may nonetheless be limited to the amount of the cap.

forego, such as unspecified damages or injunctive relief.[31]  The SAPA's Sole and

Exclusive Remedies clause provides:

> [T]he rights of the Indemnified Parties under this Article IX shall be the sole and exclusive remedies of the Indemnified Parties . . . with respect to claims resulting from any breach of a representation or warranty or failure to perform any covenant or agreement contained in this Agreement or otherwise relating to the transactions that are the subject of this Agreement . . . .[32]

However, Defendants acknowledge that the SAPA contains a fraud exception and

indeed elsewhere state "Eurofins has only two potential paths: (i) sue under the

indemnification provisions in the Agreement, or (ii) alleged [sic] a viable fraud

count."[33]

Thus, Defendants' argument seems to be essentially a technical one—that

Eurofins has not pled indemnification.  The Court will not dismiss Eurofins's

claims because the Complaint does not invoke the word "indemnification" or

because Eurofins requested remedies in Counts I or II.  Under the well-pled

---

[31] OB at 15.  Defendants later argue "[n]one of these claims is grounded in the Agreement's indemnification provisions."  Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss ("RB") at 3.

[32] SAPA § 9.6(h).

[33] Oral Arg. on Defs.' Mot. to Dismiss, Tr. 7; OB at 17-18.  Defendants assert, without citation to the fraud exception or other law, that "[f]raud claims . . . do not provide an independent basis for relief under the Agreement due to the express indemnification provisions."  RB at 4.  Some argument may exist which justifies Defendants' conclusion, but they never made it.  Moreover, a cursory review of the fraud exception appears to liberate the party asserting fraud from the entirety of the SAPA's indemnification provisions (contained within Article IX).  *See* SAPA § 9.6(c).  Thus, the parties appear to have agreed that the restricted remedies they agreed to should not apply to fraud claims and Eurofins is entitled to seek rescission or damages in excess of the cap provision.

standard of a motion to dismiss, even vague allegations in the Complaint are well-pled if Defendants were provided notice of the claim.[34]

Defendants also argue that Eurofins has failed to allege a rescission claim because it must establish (1) the existence of a fraud that would give rise to the remedy sought, and (2) that restoration of the status quo ante is possible. They argue that Eurofins has not established or alleged that the status quo ante could be restored, but do not explain why the status quo cannot be restored here. Instead, they only quote a variety of cases with distinguishable factual circumstances.[35]

---

[34] Eurofins's breach of contract claims (Counts VI, VII, and VIII) provide notice of its indemnification claim, even if it does not explicitly state that it seeks indemnification under Sections 9.2 or 9.6(h). Similarly, although Eurofins prays for an injunction (to release the escrowed funds, essentially asking for a monetary remedy) or unspecified damages and does not specifically pray for "indemnification," this pleading is sufficient to put Ricerca on notice that Eurofins is seeking indemnification. Moreover, Eurofins's injunction request appears to be supported by the plain language of Section 13.10 of the agreement. SAPA § 13.10 ("[I]n addition to any other right or remedy to which Purchaser may be entitled at law or in equity, it shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breach of any provisions of this Agreement . . . ."). Section 9.6(h), the sole remedies provision, states that it is "[s]ubject to Section 13.10." *Id.* § 9.6(h).

Eurofins, through its fraud claims (Counts III and IV), seeks an injunction to release the escrowed funds and rescission. There is no need for Eurofins to rely upon indemnification release here, because, as the Defendants have acknowledged, Eurofins may (1) seek indemnification or (2) go outside of the agreement and allege fraud. Eurofins's fraud claims, which go outside of the terms of the agreement, are not dependent on the limited remedies provided therein.

[35] *See* OB at 41 (citing *Winston v. Mandor*, 710 A.2d 831, 833 (Del. Ch. 1996) (the court was focused in part on the fact that the company in question was a public company); *Holley v. Jackson*, 158 A.2d 803, 806 (Del. Ch. 1959) (the court held an innocent misrepresentation cannot be the basis for rescission; Eurofins alleges fraud, not solely innocent misrepresentation)); RB at 27 (citing *Stegemeier v. Magness*, 728 A.2d 557, 565 (Del. 1999), *aff'd*, 748 A.2d 408 (Del. 2000) (TABLE) (the court was concerned that homes built on the land made unwinding the transaction more difficult); *Interim Healthcare Inc. v. Spherion Corp.*, 2003 WL 22902879, at *9 & n.42 (Del. Ch. Nov. 19, 2003) (the court focused on the fact that the transaction to be unwound occurred six years earlier)).

Because Defendants have not explained what factors make this transaction difficult to unwind or why these distinguishable cases must be applied here, Eurofins's rescission count survives as a remedy for its fraud claims.[36]

Eurofins's second theory supporting rescission is unilateral mistake—based on its allegations that a former Ricerca employee stated that Ricerca knew it should transfer all of the anti-infection models and that Lennox sought to cover up the loss of a major customer.[37] To prevail on its claim, Eurofins must demonstrate that it was mistaken and that Ricerca knew of its mistake but remained silent.[38] Moreover, the agreement may only be rescinded on this theory if: "(1) the enforcement of the agreement would be unconscionable; (2) the mistake relates to the substance of the consideration; (3) the mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place the other party in the status quo."[39] Court of Chancery Rule 9(b) also requires that mistake claims be pled with particularity.[40]

As discussed within, Eurofins's allegations concerning the former Ricerca employee do not satisfy Rule 9(b) and thus Eurofins cannot recover on its mistake

---

[36] Eurofins also seeks recovery under the Delaware Securities Act; its claims under that statute are addressed elsewhere. *See* Part IV.E.

[37] Compl. ¶ 123; *see infra* notes 52, 74-76 & accompanying text.

[38] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002).

[39] *Matter of ENSTAR Corp.*, 604 A.2d 404, 411 (Del. 1992) *overruled on other grounds by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund,* 68 A.3d 665 (Del. 2013).

[40] Ct. Ch. R. 9(b).

claim on that ground.[41]  Regarding the loss of the client relationship, Defendants argue that the loss of the client does not go to the substance of the SAPA's consideration.  The Court disagrees; Eurofins was purchasing a business, which included its client list and revenues, and thus the loss of a major revenue source alters the substance of the consideration exchanged as the business purchased was not what it anticipated.  Additionally, Eurofins's claims based on the client relationship are pled with particularity and they therefore survive, even though they are duplicative of Eurofins's other legal theories.[42]

## C.  *Has Eurofins Adequately Pled Fraud or Breach of Contract?*

The parties next debate whether the allegations of misrepresentations state a claim for fraud or breach of contract.  A fraud claim requires that the plaintiff allege:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[43]

Court of Chancery Rule 9(b) requires that fraud claims be pled with particularity concerning: "(1) the time, place, and contents of the false representation; (2) the

---

[41] *See infra* note 59 & accompanying text.
[42] *See* Part IV.C.2.a.
[43] *Abry P'rs V, L.P.*, 891 A.2d at 1050 (citing *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 956 (Del. 2005)).

14

identity of the person making the representation; and (3) what the person intended to gain by making the representations."[44] In other words, Eurofins must "allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[45] Malice, intent, knowledge and other mental states may be averred generally.[46]

To state a claim for a breach of contract, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.[47] The Court proceeds to review the various main topics of contention between the parties to determine whether a claim for fraud or breach of contract has been stated for each alleged aspect.

### 1. The Anti-Infection Models and the Non-Competition Provision

The CIM marketed the PHA Division as performing a wide variety of tests, including certain anti-infection tests or assays (the "Anti-Infection Models").[48] One of Ricerca's primary service lines, discovery pharmacology (the PHA Division), was comprised of work performed using the Anti-Infection Models and

---

[44] *Id.* (citation omitted).
[45] *Id.* (citation omitted).
[46] *See id.*
[47] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).
[48] Compl. ¶ 22.

was performed primarily in Bothell and Taipei. However, because the Concord facility had excess capacity, certain anti-infective work was performed there.[49]

Eurofins asserts that the parties agreed, and that the intent of the SAPA was, to transfer to Eurofins all of the stock and assets related to the discovery pharmacology business line, including the anti-infective work performed at the Concord facility.[50] Ricerca was allegedly supposed to identify all of the Anti-Infection Models on Schedule 1.1 of the SAPA, but did not, and only scheduled a limited set of models. Ricerca also allegedly included all revenue generated from use of the Anti-Infection Models, including those used in the Concord facility, in representing the value of the PHA Division to Eurofins.

Eurofins also asserts that the parties intended that Ricerca would transfer technical knowledge concerning the models.[51] Eurofins learned that it had not obtained all of Ricerca's Anti-Infection Models post-closing and obtained a former Ricerca employee's statement, along with other unspecified evidence, confirming that Ricerca knew it should have transferred all of the Anti-Infection Models.[52]

---

[49] *Id.* ¶ 23.

[50] Eurofins contends that Ricerca told it "that in addition to performing tests using the Anti-Infection Models in the PHA Division (*i.e.*, Taipei and Bothell), it was also using them at its Concord facility" because it had excess capacity. *Id.* ¶ 25.

[51] *Id.* ¶ 28. Eurofins states this technical know-how includes study design and protocols, standard lab operating procedures, models, and historical client data.

[52] *Id.* ¶ 29.

16

The SAPA also contains a non-competition clause[53] which Eurofins claims Ricerca is violating. Eurofins contends that, because all of the Anti-Infection Models should have been transferred, Ricerca would have no capacity to compete with Eurofins. Eurofins claims the non-competition clause only allowed Ricerca to continue to service current customers and to develop new customers for its toxicology business, which is distinct from the discovery pharmacology assets conveyed to Eurofins. The intended result of the non-competition provision was therefore to prevent: (1) any competitive use of the Anti-Infection Models and (2) any competitive delivery of drug discovery services to pharmaceutical companies.[54]

Eurofins contends that Ricerca has competed against it by using Anti-Infection Models with both existing customers and new customers.[55] On December 5, 2012, the parties held a conference call to discuss Ricerca's competitive activities. Ricerca's general counsel maintained that Ricerca's

---

[53] The non-competition clause provides:

> [Ricerca will not] directly or indirectly invest in, own, manage, operate, donate, contribute, grant, finance, control, gift, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged in providing drug discovery services to pharmaceutical companies, that competes with the Business or the services related to the Concord Anti-Infection Models (individually or collectively referred to as "Competing Business").

SAPA § 7.4(a).

[54] Compl. ¶ 31.

[55] *Id.* ¶ 32. Eurofins alleges that Ricerca, in October 2012, performed at least 12 different studies using the Anti-Infection Models for nine different customers, resulting in $400,000 of invoiced services.

17

activities complied with the non-competition provision because such conduct involved customers outside of the pharmaceutical industry, for example involving customers in the agricultural industry.[56] Ricerca allegedly also stated that it was impracticable to transfer certain work to Eurofins on the agreed upon date, September 18, 2012, because certain tests were works in progress.[57] Eurofins contends that this explanation contradicts the SAPA which required Ricerca to cease performing Anti-Infection Model tests and transfer the work on that date.

a. *Has Eurofins Adequately Pled Fraud Concerning the Anti-Infection Models?*

Eurofins claims that some "intent" or "agreement" existed between the parties which was not stated in the SAPA. However, these assertions are not allegations that fraudulent statements were made and do not meet the particularly requirements of Rule 9(b).[58] Eurofins has not alleged the circumstances concerning who made such an agreement or expressed such intent and where or when he or she did so. Similarly, Eurofins's assertion that a former Ricerca employee stated that Ricerca knew that all assets should be transferred[59] is not a statement evidencing fraud made by Ricerca and is not pled with particularity.

---

[56] *Id.* ¶ 33.

[57] *Id.* Eurofins uses the term "certain work" here, which the Court understands to mean the rest of the Concord models Eurofins claims should have been transferred to it.

[58] Such allegations are also inconsistent with the plain terms of the SAPA discussed below. The Court must first look to the agreement to determine the parties' intent set forth in the agreement's plain language.

[59] Compl. ¶ 29.

18

Eurofins also supports its fraud claim by alleging that Ricerca told Eurofins that it was performing tests using the anti-infection models in the Concord facility because it had excess capacity and that, when Ricerca represented the value of the PHA Division, it included all revenue generated from the use of those models, including the models used at the Concord site.[60] However, these statements are not averred with sufficient particularity. Furthermore, Ricerca's alleged statements that it was performing tests in the Concord facility is not a representation that it would sell those assets to Eurofins.

The revenue statements are alleged with the most particularity; however, Eurofins does not provide context and identify who delivered the statements, when or where they were delivered, or even which revenue statements it is referring to when asserting its claim. Ricerca's representation of the value of the PHA Division also is not a representation that Eurofins would be sold the PHA Division. Eurofins has failed to state a claim that Ricerca fraudulently misrepresented that it was selling it all of the Concord anti-infection models and thus that claim is dismissed.[61]

---

[60] *Id.* ¶ 25.

[61] Eurofins may have believed it was buying all the Concord models, but the plain language of the SAPA indicates that such a belief was not justified.

b. *Has Eurofins Adequately Pled a Breach of Contract Concerning the Anti-Infection Models?*

Eurofins's claims that the parties intended, or agreed, to transfer more assets than they did are inconsistent with the plain language of the SAPA. The terms are clear that the Concord assets to be transferred are those listed in Schedule 1.1.[62] Eurofins claims that the parties' decision to carve-out the Concord Anti-Infection Models from the Excluded US Assets (those assets not enumerated as purchased assets[63]) somehow supports its case that Ricerca was supposed to transfer all anti-infection assets at the Concord site. However, this claim again ignores the fact that the Concord Anti-Infection Models is a defined term which refers to the assets listed in Schedule 1.1, and thus the Court must follow the SAPA's plainly articulated intent to transfer only those scheduled assets.

Eurofins asserts it is entitled to all reasonable inferences and therefore Ricerca's factual contentions about intent cannot defeat its claim. Eurofins

---

[62] SAPA § 1.1 ("Purchaser shall purchase and acquire from Seller . . . (i) the Concord anti-infection models listed on Schedule 1.1 (the 'Concord Anti-Infection Models'), and (ii) all of the Seller's right, title and interest in, to and under all assets used in or relating to the Business conducted in Bothell, Washington ('Bothell Business Division'), except to the extent that the same are Excluded US Assets . . . ."). Furthermore, Section 1.1(o) makes clear that "Excluded U.S. [sic] Assets" are not those which are "used in or relating to the Bothell Business Division." *Id.* § 1.1(o). Among the list of Excluded US Assets are "Seller's operations, assets and business in Concord, Ohio . . . (other than the Concord Anti-Infection Models) . . . ." *Id.* § 1.2(j). The SAPA is thus quite clear that the only Concord models which would be transferred are those found within Schedule 1.1. No inconsistency exists between the various cross-references which identify the assets to be transferred. Similarly, Ricerca points out that the parties knew how to write "all" when they intended to transfer all assets in a given facility, as they did with the Bothell Business Division. The parties did not do that with the Concord facility and thus the parties only intended to transfer some subset of models, which they defined in Schedule 1.1.

[63] *See id.* § 1.2.

correctly states the law, but misapplies it in this context. The Court will draw all reasonable factual inferences in favor of Eurofins; however, it must follow the contract's terms to ascertain the parties' intent if it is unambiguously articulated. The terms discussed above are unambiguous and, thus, Eurofins has not stated a claim for breach of contract for a failure to deliver the SAPA's consideration.

Eurofins also claims that it is entitled to the transfer of certain "technical know-how" under the SAPA, but does not direct the Court to any SAPA provision establishing this right.[64] Eurofins states simply that this was "part of the transfer of the business."[65] Eurofins's unsupported assertions do not provide a predicate contractual term capable of supporting its right to technical know-how. Eurofins's allegations here fail to state a claim.

Eurofins next argues that Ricerca is competing against Eurofins in violation of the non-competition provision.[66] Eurofins alleges that "Ricerca has engaged in a Competing Business by continuing to use the Anti-Infection Models with both existing customers and new customers. For example, in October 2012, Ricerca performed at least twelve studies using the Anti-Infection Models for nine different customers . . . ."[67] Defendants appear to take the position that their competitive

---

[64] Compl. ¶ 28.
[65] *Id.*
[66] *See supra* note 53.
[67] Compl. ¶ 32.

activities comply with the non-competition provision because Ricerca has only competed in the agricultural industry, and not in the pharmaceutical industry.[68]

However, Eurofins is entitled to have all factual inferences resolved in its favor. Eurofins alleged broadly that Ricerca is competing with both existing and new customers which could include customers in the pharmaceutical industry.[69] A factual question exists which the Court cannot resolve at this stage of the proceedings; therefore, this claim survives the motion to dismiss.

2. The AZ Relationship

Eurofins requested information about Ricerca's primary customers and its historical revenue and anticipated revenue for the upcoming year during negotiations. Ricerca represented that AstraZeneca plc ("AZ") was one of Ricerca's top customers and generated approximately $961,000 in annual revenue for it during fiscal year 2012. Ricerca also provided a copy of its March 25, 2002, Master Services Agreement with AZ (the "AZ MSA") and an amendment extending it to allow AZ to continue to send Ricerca work orders until March 31, 2013, at which time the AZ MSA could be renewed.

---

[68] *See supra* note 56 & accompanying text.
[69] Even though Ricerca may have been entitled to retain anti-infection models at Concord that were not listed on Schedule 1.1, it was not entitled to use those retained models to compete with "the Business or the services related to the Concord Anti-Infection Models."

22

On July 3, 2012, AZ notified Baumgartner that it had selected another company as its preferred supplier, starting in September.[70] Baumgartner relayed that information to Lennox.[71] Eurofins alleges that no one from Ricerca notified Eurofins of the loss of the relationship. Instead, Eurofins received historic revenue figures inclusive of AZ-related revenue and future projections failing to account for the loss of the nearly $1 million in annual revenue provided by AZ.[72]

In August 2012, Ricerca provided Eurofins financial statements describing the firm's financial condition as of July 31, 2012. These financial statements contained projections of a revenue stream which did not account for reduced revenues as a result of AZ's finding a new preferred supplier.[73] Around August 3, 2012, Lennox instructed Baumgartner, Jacobson, Gasper, and others that the references to AZ in the CIM and in a related PowerPoint presentation developed for interested purchasers should continue to refer to AZ as a significant and valuable customer.[74] This PowerPoint thus contained projections consistent with an ongoing client relationship with AZ and listed it as a "Top 15 Client" and strategic partner.[75]

---

[70] Compl. ¶ 45.
[71] Baumgartner emailed Lennox: "[T]his one hurts not just from the loss of revenue, but the time invested in building this relationship did not help retain the business. And yes, I know the timing really sucks . . . ." *Id.*
[72] *Id.* ¶ 47.
[73] *Id.* ¶ 48.
[74] *Id.* ¶ 49.
[75] *Id.* ¶ 50.

During a due diligence call on August 16, 2012, Joseph Dunham ("Dunham") of Eurofins asked Jacobson and Gasper about any anticipated changes in Ricerca's customer base. No anticipated changes were disclosed, allegedly at Lennox's direction, despite their knowledge that AZ had selected a new preferred supplier.[76]

Certain provisions of the SAPA also relate to the AZ relationship. Ricerca represented that AZ was one of its top-ten revenue generating clients for the period ending July 31, 2012 and also disclosed certain contracts Ricerca had entered into with AZ.[77] Ricerca also represented that since July 31, 2012, Ricerca had not:

> Had any customer or client terminate (or communicate in writing to any Company the intention or threat to terminate) its relationship with the Business, or reduce (or communicate to any Company in writing the intention or threat to reduce) substantially the quantity of products or services it purchases from the Business, except in the Ordinary Course[.][78]

Ricerca made an additional representation concerning its disclosures, to which Eurofins refers when alleging other misrepresentations in its Complaint:

> Disclosure. No representation or warranty by Seller [Ricerca] contained in this Agreement, and no statement contained in the Disclosure Schedules or any other document, certificate or other instrument delivered to or to be delivered by or on behalf of Seller pursuant to Section 3.1(k) of this Agreement, contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it

---

[76] *Id.* ¶ 52.
[77] *See* SAPA § 4.4(d) & Schedule 4.4(d).
[78] SAPA § 4.2(h)(viii).

24

was or will be made, in order to make the statements herein or therein not misleading.[79]

The SAPA also contains a bring-down condition:

> The representations and warranties of Seller [Ricerca] and Seller Principal [RHI] set forth in this Agreement . . . shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date with the same effect as though made as of the Closing Date . . . .[80]

Finally, Ricerca agreed to provide notice to Eurofins if it became aware of a fact or condition that caused or constituted a breach of a representation or warranty in the SAPA between the signing and closing of the Agreement.[81]

AZ sent its last project to Ricerca in August 2012 and thus Eurofins asserts that AZ had substantially reduced the quantity of services it purchased from Ricerca between July 31, 2012 and September 18, 2012, the date the SAPA was executed.[82] After closing, Eurofins learned that AZ had moved its business to a competitor, which it claims resulted in a substantial and material impact on the revenue and the value of the business it purchased.[83]

a. *Has Eurofins Adequately Pled Fraud Concerning the AZ Relationship?*

Eurofins alleges that the financial statements Ricerca provided it which included AZ revenues and the conference call in which Dunham asked Jacobson

---

[79] *Id.* § 4.12.
[80] *Id.* § 3.1(a).
[81] *Id.* § 7.7.
[82] Compl. ¶ 57.
[83] *Id.* ¶ 61.

and Gasper about anticipated changes constituted fraudulent misrepresentations. It also asserts that one of the representations made under the SAPA was fraudulent. Defendants argue that the conference call fails to state a claim because Jacobson and Gasper cannot be deemed to have imputed knowledge based upon Baumgartner's and Lennox's July 3 email contemplating the loss of AZ's business as a preferred supplier.

However, as Defendants elsewhere acknowledge, "when a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[84] Here, Eurofins has sufficiently alleged that Defendants had knowledge of the July 3 email discussing AZ's decision to use a different preferred supplier and it is reasonable to infer that various participants on the deal team leading the transaction put Jacobson and Gasper in a position to know these facts.

Eurofins also asserts that Defendants fraudulently represented in the SAPA that no customer substantially reduced its business before the agreement was signed. Defendants argue that Eurofins has not averred with particularity that a substantial reduction in the quantity of products or services occurred. Eurofins alleged that AZ sent its final project to Ricerca in August and as a result had

---

[84] *Abry P'rs V, L.P.*, 891 A.2d at 1050.

substantially reduced the quantity of services it purchased from Ricerca.[85]  This sufficiently states a claim for fraud, and, along with the claim discussed above, allows Eurofins's fraud claim concerning the AZ relationship to proceed.

However, no claim of fraud exists under the representation and warranty based on AZ's disclosure to Ricerca on July 3, 2012 that it would work with a new preferred supplier in the future.  This portion of the representation and warranty only stated that Eurofins's customers did not terminate their relationships after July 31, 2012 and that statement was accurate because AZ notified Ricerca it had a new preferred supplier before July 31.  Thus, this representation was not falsely made and reflected an agreed-upon allocation of risk between the parties.[86]

b. *Has Eurofins Adequately Pled a Breach of Contract Concerning the AZ Relationship?*

Defendants again argue that AZ informed Ricerca that AZ would not renew their agreement on July 3, 2012, before the period beginning July 31, 2012 for which Ricerca represented and warranted that no client or customer had terminated a relationship with it.  Defendants are correct that no breach of contract claim is

---

[85] Compl. ¶ 57.  Defendants also argue that because Eurofins has not alleged that the AZ MSA was not breached, Eurofins has somehow failed to state a claim.  However, the representation and warranty only contemplates a substantial decline in business, not the breach of an agreement and, thus, whether it was breached is not determinative of the question of whether the representation was falsely made.

[86] *See Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881, at *12-13 (Del. Ch. May 29, 2013) (concluding that an alleged misrepresentation occurring outside of the time period of representations and warranties was not misleading because the time limitations reflected an agreed upon allocation of risk).

stated based on when AZ terminated its relationship with Ricerca; just as no fraud claim was stated based on those grounds.

However, Eurofins has stated a breach of contract claim concerning whether the amount of products and services sold to AZ substantially declined in the period between July 31, 2012 and the signing (or closing) of the SAPA. It did this unambiguously when it alleged: "AZ sent its final project to Ricerca in August 2012. Thus, between July 31, 2012 and September 18, 2012 (the date the SAPA was executed), AZ had, in fact, substantially reduced the quantity of services it purchased from Ricerca."[87] This allegation sufficiently alleges a violation of the SAPA's representation that a purchaser had not substantially reduced the quantity of products or services it purchased from Ricerca.[88] Eurofins's claim may proceed.

---

[87] Compl. ¶ 57. Eurofins made similar allegations elsewhere. *See also id.* ¶¶ 58, 61.

[88] The parties allocated risk with respect to a customer's informing Ricerca of its intent to reduce its business relationship and its actual reduction of business within a specific timeframe— between July 31 and September 18 (when the SAPA was signed). AZ had told Ricerca about its selection of a new preferred supplier in early July—outside of the period within which Ricerca was obligated to provide a representation. Thus, the representation as to AZ was accurate. The bring down also was accurate because it was bounded by the initial date of July 31 and AZ's statement preceded that date. Eurofins, however, has also alleged a breach of the other prong of this representation—that there had been no actual reduction in business within the specified window. Eurofins alleges that a significant reduction in the AZ business had occurred by September, during the applicable window. Thus, Eurofins has adequately alleged a breach of this representation.

3. Has Eurofins Adequately Pled Fraud Concerning the
   Taiwan Pension Plan?

Ricerca Taiwan sponsored a defined benefit pension plan (the "Plan").[89] During negotiations, Ricerca provided a February 7, 2012 actuarial report to Eurofins confirming its representation that, as of December 31, 2011, the Plan was overfunded by nearly $1.2 million.[90] The actuarial report relied on a projected average three percent annual salary increase during the 2012 year. However, Ricerca made a merit adjustment to employees' salaries in February 2012,[91] which resulted in an actual salary increase of three and a half percent in 2012. Jacobson also represented to Dunham, allegedly under Lennox's supervision, that this excess funding was an "asset," which could and should be part of the calculation of the PHA Division's value.[92]

On August 23, 2012, Eurofins's Dunham traveled to Taipei, Taiwan to meet with Ricerca's principals and to review Ricerca's Taipei operations and the Plan. During this trip, Dunham asked Kenny Lee, an employee of Ricerca's actuary, what factors could cause the Plan's overfunded status to decrease from the level shown in the 2012 actuarial report.[93] Lee represented, in the presence of Baumgartner and other Ricerca employees, that it would take four to five years for

---

[89] Compl. ¶ 62.
[90] *Id.* ¶¶ 64-65.
[91] *Id.* ¶ 63.
[92] *Id.* ¶ 66.
[93] *Id.* ¶ 68.

29

interest rate fluctuations to "self-correct" the Plan to an equalized funding status. None of the Ricerca employees supplemented or corrected Lee's representation, even though some of those present had received (or knew about) salary increases above the three percent figure relied upon for the 2012 forecast.[94]

Eurofins alleges it made several requests for specific information regarding the salary level of employees of Ricerca Taiwan during due diligence,[95] but Ricerca did not at any point disclose the increased salary levels. Eurofins argues that Ricerca also made relevant representations in the SAPA. For example, since July 31, 2012, Ricerca had not

> increased any form of compensation or other benefit payable or to become payable to Employees, except increases made in the Ordinary Course that do not exceed 2% of the amount of the aggregate salary compensation payable to Employees before the increase[.][96]

Eurofins contends this was misleading given Ricerca's failure to disclose the material changes to salaries in February 2012 and that Ricerca either made fraudulent statements or actively concealed information in the parties' earlier communications. After closing, Eurofins engaged a pension actuary to value the Plan as of closing who concluded it was overfunded by only $824,620.[97] Although

---

[94] *Id.* ¶ 69.

[95] *Id.* ¶ 71. Such requests included: (1) a list of employees broken down by name and current compensation and employment status, (2) a description of salary structure including salary ranges and compensation guidelines, and (3) a description of all benefit plans, including annual reports for those plans if applicable (inclusive of employee and employer cost for all plans).

[96] SAPA § 4.2(h)(xiv).

[97] Compl. ¶ 77.

Eurofins committed to rebate a portion of the overfunded amount to Ricerca, because of the material misstatements Eurofins alleges, it has not remitted that amount.[98]

Eurofins alleges that the actuary's report reiterated Ricerca's representation that, as of December 31, 2011, the Plan was overfunded. However, Eurofins never alleges with particularity in the Complaint that supplying a stale projection, at a later date, constituted a fraudulent misrepresentation. It argues in its answering brief that the outdated projection was a misstatement because the salary increase had already occurred.[99] However, Eurofins's generalized allegations do not satisfy Rule 9(b) because they do not describe who delivered the actuarial report to it or the circumstances under which it received the report.[100] Eurofins never pled that the delivery of the report in February was accompanied by representations that it was accurate as of that date or that Eurofins understood the report to be anything other than a set of outdated projections, with underlying assumptions that could change with time.

Jacobson's statement, allegedly at Lennox's direction, that the overfunded pension was an asset does not sustain a fraud claim. Eurofins does not contend that the pension was not an asset and the mere assertion that the projected amount

---

[98] *Id.* ¶ 78.
[99] AB at 30-31.
[100] It simply alleges that "Ricerca" provided the report. Compl. ¶ 65.

turned out to be less than expected does not make Jacobson's statement a misstatement. The statement of Ricerca's actuary, that the Plan would self-correct in four to five years, is also projection,[101] and allegations have not been made that this statement constituted promissory fraud. Eurofins has no claim for fraud based on the contract's representations and warranties as the SAPA is clear that Ricerca's representation was only for the period of time between July 31, 2012 and signing.[102]

Finally, although Eurofins appears to argue that the failure of certain Ricerca employees to speak up about their raises forms the basis for active concealment,[103] that claim is not alleged with particularity. Eurofins has not pled an affirmative act designed, or intended, to prevent the discovery of facts giving rise to the fraud claim.[104] The failure of these employees to speak up is not akin to the instruction Lennox allegedly provided to other Ricerca employees not to mention the loss of

---

[101] *See, e.g.*, *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009); *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *9 (Del. Ch. Dec. 23, 2008); *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *4 (Del. Super. Apr. 12, 2001)).

[102] *See supra* note 86.

[103] AB at 32-33. If Eurofins is claiming Ricerca had a duty to speak, Ricerca's response to Eurofins's question about what could cause the pension to no longer be overfunded, as alleged, was not misrepresentative. The question was not specific enough to prompt a response that certain employees had received a salary increase earlier in the year. Similarly, Eurofins's claims that it made certain requests during due diligence for information are not plead with particularity. Eurofins has not explained when such requests were made or that any representations were made in response to them which were false.

[104] *See Transdigm Inc. v. Alcoa Global Fasteners, Inc.*, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013).

32

AZ as a customer. Thus, Eurofins's allegations here fail to state a claim for fraud.[105]

4. The Sublease, the Condition of the Subleased Space, and the Expenses

During negotiations, Ricerca disclosed to Eurofins the March 5, 2010 sublease for the Bothell facility and an August 27, 2012 sublease amendment (the "Sublease"). The Sublease was set to expire on September 30, 2012, but the owner and tenant agreed to allow Eurofins to remain in the subleased space until December 31, 2012.[106] On August 21, 2012, Eurofins's Dunham asked Jacobson about the status of renewing or extending the Sublease's term. Allegedly under Lennox's supervision, Jacobson represented that he had spoken to both the owner and tenant, that they would extend the Sublease, and that Eurofins would not have a business continuity issue with the Bothell operations.[107]

Upon closing, Ricerca assigned the Sublease to Eurofins. Soon thereafter, Eurofins initiated discussions with the property's owner and tenant regarding an extension or renewal of the Sublease.[108] Neither party was receptive and Eurofins, at the time of suit, was paying the monthly rent for the subleased space on an

---

[105] Finally, Eurofins claims that even an innocent misrepresentation may give rise to actionable fraud. However, as discussed, Eurofins has not alleged misrepresentations with particularity which could satisfy Rule 9(b). Eurofins's claims regarding the actuary's February report may come the closest to being properly pled, but it has only alleged that certain projections from December 2012 were no longer accurate. It has not alleged any representation was made when the report was delivered which stated the out-of-date projections were still accurate.

[106] Compl. ¶ 81.

[107] Id. ¶ 83.

[108] Id. ¶ 87.

expired sublease.[109]    Eurofins therefore claims Jacobson either never had a conversation about extending the Sublease or he fraudulently stated the owner and tenant would extend it.

The Sublease also required Ricerca to maintain and to keep in good repair the HVAC system in the Bothell facility.[110]   In the SAPA, Ricerca represented that "[t]he heating, ventilating, plumbing, drainage, air conditioning systems and other systems (collectively, the 'Systems') in the . . . Leased Premises, are in good operating condition and repair, subject to normal wear and tear."[111]   It also represented that Eurofins was not "in breach or default in any material respect and, to Seller's Knowledge, no event has occurred which, with notice or lapse of time or both, would constitute a breach or default in any material respect . . . [as to the Sublease]."[112]

Eurofins claims that when Ricerca executed the SAPA, the HVAC system was not in good repair and Ricerca was in breach of the Sublease.  Ricerca had been advised that it would cost at least $45,000 to repair the system and if those repairs were not promptly completed, further damage could result.[113]   Eurofins states it was not made aware of the HVAC system's problems.

---

[109] The Court was advised at oral argument that Eurofins no longer occupies the Bothell facility that was the subject of the Sublease.

[110] *Id.* ¶¶ 91-92.

[111] SAPA § 4.3(d).

[112] *Id.* § 4.3(b)(ii).

[113] Compl. ¶ 98.

Ricerca paid Ricerca Intermediate and RHI for various services they provided (the "Expenses"), such as information technology and marketing services, which were reflected on the PHA Division's financials as intercompany payables.[114] When discussing the methods used and allocation of costs and expenses during due diligence, Gasper explained that Ricerca was more profitable than certain RHI subsidiaries. Thus, a disproportionate share of the Expenses was allocated to the PHA Division because it could absorb them without creating an undesirable impact on profitability and, he asserted, the Expenses charged to Ricerca were higher than the amounts actually needed to run the business.[115] During a conference call, Gasper stated that some or all of the Expenses should and could be added back to the income statement to calculate the business's value, because it would no longer pay disproportionately allocated expenses.[116]

Eurofins alleges these misrepresentations caused Eurofins to overvalue the PHA Division by more than $1 million in the aggregate.[117] After closing, Eurofins learned Ricerca's representations concerning the Expenses were not true and that the Expenses reflected the true operating cost of the business.[118]

---

[114] *Id.* ¶ 103.
[115] *Id.* ¶ 105.
[116] *Id.* ¶ 106.
[117] *Id.* ¶ 107.
[118] *Id.* ¶ 109.

### a. *Has Eurofins Adequately Pled Fraud Concerning the Sublease?*

Defendants assert that Eurofins's claims concerning the Sublease are, at most, breach of contract claims, and not fraud claims, and that because the Sublease was actually extended for three months and its agent asserted the Sublease would be extended, no false statement was made.[119] In this regard, the Defendants are correct. Eurofins, however, points to another alleged fraudulent statement: that the Sublease "would not have a business continuity issue for the Bothell operations."[120] Eurofins did not allege that it suffered a business continuity issue, and it apparently was still using the Bothell location when the Complaint was filed. In sum, no fraud has been alleged regarding the Sublease.

### b. *Has Eurofins Adequately Pled a Breach of Contract Concerning the Sublease?*

Defendants contend that Eurofins has not alleged any factual basis supporting the claimed breaches of certain representations and warranties concerning the leased premises.[121] Both parties' briefing addressing this claim is limited and Eurofins responds by asserting generally that Ricerca's

---

[119] Sections of Defendants' briefs are captioned as though they intended to argue that Eurofins failed to state a fraud claim based upon misrepresentations relating to the subleased space's condition. *See* OB at 28; RB at 15. However, they never did so and thus the claim survives. *See* OB at 28-31; RB at 15-17.

[120] Compl. ¶ 83.

[121] *See* SAPA §§ 4.3(b)(ii)-(iii).

representations—that the Sublease would be extended and that no business continuity issues would result—violated multiple sections of the SAPA.[122]

The plain language of the provisions Eurofins cites does not support its claims. Section 4.2(h)(viii), discussed when considering the AZ claim, represents that clients or customers have not substantially reduced their business during stated time periods. This provision applies to clients and customers rather than to lessors or sublessors. Section 4.3(b)(ii) requires that no breach or default of any leases has occurred and no event has occurred which would give rise to such a breach or default. Eurofins has not alleged that any such event occurred. Eurofins admits that the Sublease was actually renewed and then expired: that is neither a breach, nor a default, nor an event giving rise to a breach or default. The asserted business continuity event also does not violate this section. Section 4.3(b)(iii) requires that Ricerca not have assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any lease; again Eurofins has not alleged that any such acts occurred. Section 4.3(d) represents that facilities are free from structural defects; this portion of Eurofins's claims concerning the Sublease does not state a claim that structural defects existed.

Finally, Section 4.12 requires that Ricerca not have omitted to state any material fact necessary which would make its representations and warranties

---

[122] *See* AB at 43 (citing SAPA §§ 4.2(h)(viii), 4.3(b)(ii), 4.3(d), and 4.12).

misleading.[123]  The Court infers that Eurofins is contending that Section 4.12, in conjunction with Sections 4.3(b)(ii) or 4.3(b)(iii), could omit to state a fact which makes those sections misleading.  Although Section 4.12 provides a certain amount of leeway for arguably misleading statements, the Court concludes no claim is stated under this provision.  Even if Ricerca knew the Sublease would only be extended once, that cannot be characterized as a breach or an event leading to a breach or default.  It also cannot be characterized as an assignment or conveyance or another related encumbrance.  Eurofins's allegations do not state a claim for breaches of these provisions.

### c. *Has Eurofins Adequately Pled a Breach of Contract Concerning the Condition of the Subleased Space?*

Defendants argue that the damages alleged based on the HVAC system's disrepair do not satisfy the SAPA's basket provision and that Eurofins has not alleged it incurred any HVAC repair costs or that the breach was material.  As discussed above, the SAPA's basket provision is based on aggregate damages and thus the alleged damages of the HVAC need not exceed $50,000 if other damages within the Complaint collectively exceed that amount.  The damages alleged elsewhere exceed the basket provision and thus the HVAC claim will not be disqualified for failure to satisfy it.

---

[123] *See supra* note 79 & accompanying text.  This provision of the SAPA may only relate to certain enumerated written documents, although the parties have not argued the issue.

Eurofins again responds summarily that Ricerca violated Sections 4.2(h)(viii), 4.3(b)(ii), 4.3(d) and 4.12 of the SAPA. Eurofins has alleged that the HVAC system's maintenance was in violation of the Sublease and that Eurofins would be immediately responsible for costly repairs.[124] The Court was not directed to, and was unable to independently locate, any SAPA provision requiring Eurofins to plead that it has paid for the damages before being indemnified for a false representation and thus concludes Eurofins's pleading is sufficient.

Although Eurofins does not use the term "material," it describes the repairs as "significant" and alleges the cost of damages.[125] On a motion to dismiss, this satisfies the Court that Section 4.3(b)(ii)'s materiality qualifier has been met. Perhaps more importantly, Defendants' argument also completely ignores Section 4.3(d), which has no materiality qualifier. The facts alleged appear to state a claim under Section 4.3(d) as well, which only requires that "air conditioning systems and other systems . . . are in good operating condition and repair, subject to normal wear and tear."[126] At the least, Defendants have not explained why the claim should be dismissed under this contractual provision and thus it shall not be.

---

[124] Compl. ¶ 154.
[125] *Id.* ¶¶ 100, 102.
[126] SAPA § 4.2(d).

d. *Has Eurofins Adequately Pled Fraud Concerning the Expenses?*

In addition to the representations discussed above,[127] Eurofins alleged that Ricerca made specific representations assigning dollar values to the over-allocated Expenses.[128] Defendants claim these statements were imprecise statements made during due diligence upon which a party could not reasonably rely. The Court disagrees: the statements were sufficiently precise in estimating values by which Ricerca suggested or implied that Eurofins should reduce its projections of expenses owed and the question of reasonable reliance is a factual one to be answered after discovery. Defendants next assert that Eurofins never informed Ricerca of its analysis and thus Ricerca never approved it; however, Eurofins need not inform Ricerca that it intended to rely reasonably on Ricerca's statements to state a claim for fraud.

Defendants argue that the Expenses are described generally and there is no allegation that the exact same services were being utilized by Eurofins after the transaction. They also argue their representative's statements were mere puffery and that Eurofins's claim that the Expenses it paid were higher than anticipated

---

[127] *See supra* notes 115-18.
[128] Eurofins alleges that Ricerca's representative asserted that its sales and marketing expenses were over-allocated by $448,000 and its corporate finance service fees and corporate IT service fees were over-allocated by the amounts of $146,000 and $46,000 respectively. *Id.* ¶ 107. In the aggregate, Eurofins claims these misrepresentations caused it to overvalue the PHA Division by more than $1 million.

does not lead to a reasonable inference that Ricerca's statements about them were false when made.

However, Eurofins has defined the Expenses sufficiently to describe the contents of the false statement and to be interpreted as more than mere puffery. Eurofins also need not specifically state that the exact same services are being used where that is the obvious import of its Complaint, and as alleged it is reasonably conceivable that Eurofins's statements could support a claim that Ricerca's representative encouraged Eurofins to raise its purchase price based on the savings it was told it could anticipate concerning the Expenses. Eurofins adequately pled fraud concerning the Expenses by identifying Ricerca's representations as to the value of the various over-allocated Expenses and Gasper's representation that those values should be added back to the income statement.

D. *Has Eurofins Adequately Pled Equitable Fraud?*

Equitable fraud, also known as negligent misrepresentation, requires "(1) a particular duty to provide accurate information, based on the plaintiff's pecuniary interest in that information; (2) the supplying of false information; (3) failure to exercise reasonable care in obtaining or communicating information; and (4) a pecuniary loss caused by justifiable reliance on the false information."[129] It is similar to a claim of fraud, but requires a reduced level of intent, such as

---

[129] *Metro. Life Ins. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *17 (Del. Ch. Dec. 20, 2012) (citation omitted).

negligence.[130]  Defendants argue that Eurofins's equitable fraud claims fail for the same reasons considered above relating to fraud.  No claim was dismissed or survived based on any consideration of Defendants' intent and thus those fraud claims dismissed above are also dismissed for equitable fraud and those not dismissed survive.

However, Defendants offer a second reason that Eurofins's equitable fraud count should be dismissed: that Ricerca did not have a fiduciary relationship with Eurofins and instead the two were arm's-length counterparties.  Defendants cite an opinion's statement that "[e]quitable fraud . . . requires special equities, typically the existence of some form of fiduciary relationship" and that there was "no room . . . for the doctrine" for "counterparties who negotiated at arms' length."[131]  Defendants' quotation cuts short the opinion's description of the special equities, which continues to explain that "other circumstances might be cited" as well.[132]

These other circumstances include situations "where equity affords its special remedies, e.g., rescission," or other equitable remedies are sought.[133]  Eurofins seeks rescission of the SAPA and thus has pled a special circumstance

---

[130] *Addy v. Piedmonte*, 2009 WL 707641, at *18 n.98 (Del. Ch. Mar. 18, 2009) (contrasting to knowing or reckless misrepresentations).
[131] *Airborne Health, Inv. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009).
[132] *Id.*
[133] *Ameristar Casinos, Inc. v. Resorts Int'l Hldgs.*, 2010 WL 1875631, at *12 (Del. Ch. May 11, 2010).

supporting its claim.[134]  Accordingly, although these claims are duplicative of Eurofins's fraud claims and, in the context of an arm's length transaction negotiated by sophisticated parties, equitable fraud should have a narrow role, the claims survive.

E. *Has Eurofins Adequately Pled a Violation of the Delaware Securities Act?*

Eurofins alleges that Ricerca violated the Delaware Securities Act[135] by selling Ricerca Taiwan's stock by means of untrue statements.  Defendants argue that Eurofins's allegations were not sufficiently pled to demonstrate a nexus to Delaware and thus should be dismissed.[136]

The Delaware Securities Act "only applies where there is a sufficient nexus between Delaware and the transaction at issue."[137]  Furthermore, our Supreme Court explained that there is "a presumption that a law[, such as the Delaware

---

[134] Compl. ¶ 139.  If the prayer for equitable relief is the only offering supporting the equitable fraud claim, it may be found to lack a "firm[] basis in equity jurisdiction."  *See U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *26 (Del. Ch. June 6, 1996).  Here, because some basis for fraudulent behavior is based in the AZ claim, this add-on claim is permitted.  It has been noted that our law of equitable fraud is "not as well defined as other areas of Delaware jurisprudence."  *Homan v. Turoczy*, 2005 WL 2000756, at *13 n.40 (Del. Ch. Aug. 12, 2005).  Its place in a commercial relationship negotiated by sophisticated parties should be limited, but this claim does survive.

[135] 6 *Del. C.* §§ 73-201, 73-605(2).

[136] Eurofins first argues that the SAPA's choice of law provision requires that "all disputes [] be resolved according to Delaware law in the Delaware Court of Chancery."  AB at 46.  Certainly, an analysis of whether the Delaware Securities Act applies is an application of Delaware law and therefore complies with the choice of law provision.  However, Eurofins's argument is not responsive to the issue of whether it alleged a nexus to Delaware.

[137] *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *19 (Del. Ch. Dec. 1, 2009).

Securities Act,] is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."[138] The Court continued:

> [W]e do not read the Act as an attempt to introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered here. Of course, a Delaware corporation is bound by the Act, if it is otherwise applicable. But it is not bound simply because the company is incorporated here.[139]

Moreover, it concluded that there was too fragile of a basis for jurisdiction over "an alleged fraud in Pennsylvania or over a contract made in New York."[140] Thus, in *Magnavox*, the Supreme Court focused on where the fraud occurred or the contract was made and stated that the place of incorporation is of lesser importance.

Eurofins's alleged nexus is based on the facts that it is a Delaware corporation and that two Defendants, Ricerca and RHI, are Delaware entities. The Complaint does not allege a nexus to Delaware based on where the stock sale negotiations or fraudulent statements occurred or where the SAPA was executed. Furthermore, the security involved was the sale of the Taiwanese stock of a Taiwanese entity. The Court concludes that such an allegation based solely on the status of certain parties to the litigation is insufficient to allege a nexus capable of stating a claim under the Delaware Securities Act. This is consistent with

---

[138] *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).
[139] *Id.*
[140] *Id.* at 982.

*Magnavox*'s statement that the act is not intended to have extraterritorial reach and with similar laws found in other jurisdictions.[141]

## F. *Has Eurofins Adequately Pled a Violation of the Implied Covenant of Good Faith and Fair Dealing?*

Eurofins re-alleges the events discussed above as breaches of the SAPA's implied covenant of good faith and fair dealing.[142] Under Delaware law:

> [A] court confronting an implied covenant claim asks whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter.[143]

The covenant asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."[144] Additionally, "[e]xpress contractual provisions always supersede

---

[141] 69A Am. Jur. 2d Securities Regulation—State § 17 ("The fact that all of the sellers reside in a jurisdiction does not mean that such jurisdiction's blue sky laws apply if all the acts complained of take place in another jurisdiction. Furthermore, a jurisdiction cannot require registration of a foreign issue, even though much of such issue is to be sold to residents of the jurisdiction, so long as none of the transactions involved occur within the jurisdiction; if such transactions are lawful where they occur, they must be considered to be valid in a second jurisdiction, even though they would have been invalid had they occurred in such second jurisdiction as being violative of the blue sky law of that jurisdiction." (citations and quotations omitted)).

[142] Specifically, it states that the covenant was violated by Ricerca's failure to make full disclosure surrounding the AZ relationship, the Plan, the Sublease, the condition of the subleased space, the Expenses, and by not completely identifying all of the anti-infection models to be transferred through the SAPA.

[143] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[144] *Id.*

45

the implied covenant . . . ."[145]  Thus, "[t]he implied covenant of good faith and fair dealing cannot properly be applied to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'"[146]

The Court concludes that the implied covenant of good faith and fair dealing is superseded by the SAPA's terms.  Most of Eurofins's claims arise from the agreement's representations and warranties.  These are express contractual terms which function as a method of apportioning risk between the parties as to unknown events or which seek to draw out information by making a party pay for misinformation it provides.  They are promises made at the time of signing and closing and are not intended to manage the ongoing relationships of the agreement's signatories.  Thus, the Court concludes that these were express contractual provisions which represent the limits of what the parties agreed to in their original bargaining positions at the time of contracting.  The implied covenant should not be applied to give Eurofins protections which it did not secure during signing.

The provisions concerning the consideration under the contract also function as express contractual provisions which should not be displaced.  These provisions are set out in great detail and define which assets are included as Concord assets and as Excluded US Assets (among other defined terms specifying the

---

[145] *Id.* at 419.
[146] *Winshall*, 76 A.3d at 816.

consideration). Furthermore, because these terms defined the consideration, they were likely terms which both sides scrutinized heavily to ensure the proper assets and stock were conveyed. Again, there is little room for discretion from the parties and thus these provisions appear to represent the culmination of what the parties agreed to based on their bargaining positions at the time of signing. This also appears to be a fully considered issue stated in express terms which leaves no room for the implied covenant and thus, the entirety of this claim must be dismissed.

## G. *May Eurofins Bring Claims Against Lennox?*

Counts I-V (all claims but the breach of contract claims) were asserted against Lennox. The Delaware Securities Act claim against him shall be dismissed for the reasons discussed above; Eurofins has not argued that a unique nexus exists between Lennox and Delaware and thus the reasoning above applies equally to Lennox. Defendants argue that Lennox did not sign the SAPA and there is no allegation he ever undertook any obligation in connection with it.[147] Defendants also argue that because the fraudulent statements Ricerca allegedly made concerning the AZ relationship are based upon representations made within the

---

[147] OB at 44.

SAPA, our ordinary presumption protecting corporate officers and directors from liability on corporate contracts should apply.[148]

However, Defendants ignore that Delaware law permits a corporate officer to be "held personally liable for the torts he commits and [he] cannot shield himself behind a corporation when he is a participant."[149] Eurofins has pled that Lennox personally participated in Ricerca's fraud when it alleged his involvement in directing the due diligence team's response to AZ terminating the Eurofins's relationship and thereby stated a claim.[150] Defendants argue that the "fraud claims do not arise independently of the underlying contract."[151] Defendants misrepresent the allegations; Eurofins has alleged that Lennox's fraudulent statements preceded the SAPA and induced Eurofins to sign it and thus the claim against Lennox concerning the AZ relationship survives.[152]

Nonetheless, Eurofins's other claims against Lennox may be dismissed because they are not pled with particularity and cannot survive Rule 9(b).[153] When

---

[148] *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *11 (Del. Ch. May 5, 2010) ("It is true that under Delaware law corporate officers and directors are not parties to a contract simply because the corporation they serve is a party to the contract.").

[149] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009).

[150] Compl. ¶¶ 45, 49.

[151] *Brasby v. Morris*, 2007 WL 949485, at *8 (Del. Super. Mar. 29, 2007).

[152] *See id.* at *7 ("Allegations of fraud that go directly to the inducement of the contract, rather than its performance, [] present a viable claim.").

[153] *See Shamrock Hldgs. of Calif., Inc. v. Iger*, 2005 WL 5756479, at *7 (Del. Ch. June 6, 2005) ("Fraud claims are subject to the heightened pleading standards of Court of Chancery Rule 9(b)."). The 9(b) standard applies to both the fraud claims and equitable fraud claims asserted against Lennox. *See id.* (applying Rule 9(b) to equitable fraud claims).

asserting its other claims, Eurofins's allegations are much more general and state only that certain employees were under Lennox's supervision or that Lennox generally directed all of the events within the Complaint.[154] These allegations fall short of Rule 9(b)'s pleading requirements; therefore, the remaining claims against Lennox are dismissed.

## V. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is granted in part and denied in part. Eurofins's claims involving the assets sold to it under the SAPA and the associated transfer of technical knowledge, its claim premised on the extension of the sublease, its fraud claim related to Ricerca Taiwan's pension plan, its unilateral mistake claim based on the anti-infection models, and its claims arising under the Delaware Securities Act and the implied covenant of good faith and fair dealing are dismissed as to all Defendants. Furthermore, all claims against Lennox, other than those concerning the AZ relationship, are dismissed.

Counsel are requested to confer and to submit an implementing form of order.

---

[154] *See* Compl. ¶¶ 5, 10, 66, 83, 105, 128.

49