DCV HOLDINGS, INC., Plaintiff
Below, Appellant,

v.

CONAGRA, INC., E.I. du Pont de Nemours and Company, and DuPont Chemical & Energy Operations, Inc., Defendants Below, Appellees.

No. 166,2005.

Supreme Court of Delaware.

Submitted: Oct. 26, 2005.
Decided: Dec. 8, 2005.

David J. Margules and Joel Friedlander, Esquires, of Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Of Counsel: Stuart L. Shapiro (argued)[1] and Jason Vigna, Esquires, of Shapiro Forman

1. The case was argued by counsel on September 14, 2005, but after supplemental briefing, was submitted for decision on briefs on October 26, 2005.

Allen Sava & McPherson LLP, New York, New York; for Appellant.

Donald J. Wolfe, Jr., and Kevin R. Shannon, Esquires, of Potter Anderson & Corroon, LLP, Wilmington, Delaware; Of Counsel: David H. Pittinsky (argued) and Stephen J. Kastenberg, Esquires, of Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania; for Appellees E.I. du Pont de Nemours and Company and DuPont Chemical & Energy Operations, Inc.

Lisa A. Schmidt and Michael R. Robinson, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: James P. Fitzgerald (argued), Mark F. Enenbach and Thomas O. Kelley, Esquires, of McGrath, North, Mullin & Kratz, PC LLO, Omaha, Nebraska; for Appellee ConAgra Foods, Inc.

Before STEELE, Chief Justice, and HOLLAND and JACOBS, Justices.

JACOBS, Justice.

DCV Holdings, Inc., plaintiff-below appellant (the "Buyer"), appeals from a final judgment of the Superior Court dismissing the Buyer's fraud and breach of contract claims against the defendants-below appellees, ConAgra, Inc., E.I. du Pont de Nemours and Company, and DuPont Chemical & Energy Operations, Inc. (collectively, the "Sellers").

The lawsuit resulted from the Buyer's August 1997 leveraged buyout, from the Sellers, of DCV, Inc. and DCV's independent operating companies ("IOCs"), which included DuCoa, Inc. ("DuCoa"). After the purchase, DuCoa suffered a decline in profits, and it also was discovered that DuCoa had been involved in an international price fixing scandal that implicated DuCoa in antitrust violations. As a conse-

quence, the Buyer brought an action against the Sellers in the Superior Court, seeking (i) rescission of the Purchase Agreement grounded on common law fraud, and (ii) contractual indemnification under the Purchase Agreement for liabilities resulting from the antitrust violations. The Superior Court dismissed the Buyer's fraud and contract claims, and the Buyer appeals from that dismissal.

The Buyer contends that the Superior Court dismissed its common law fraud claim based on two erroneous factual findings. The first finding was that a false pre-acquisition income item on DuCoa's books (the "TMA rebate")[2] had been adequately disclosed to, and was known by, the Buyer before the acquisition transaction closed. The second allegedly erroneous finding was that the false rebate was not material to the Buyer. The Buyer also contends that in dismissing its breach of contract claim, the Superior Court erred in finding that the Sellers had never contracted to indemnify the Buyer for liabilities that were unknown to the Sellers at the time of the closing (specifically, the antitrust violations). We conclude that the evidence of record amply supports the Superior Court's findings of fact and conclusions of law, and, therefore, affirm.

### Procedural History

In 1998, the Buyer brought a Superior Court action against the Sellers for rescission of the Purchase Agreement, punitive damages, and (alternatively) for indemnification from the Buyer's antitrust-related losses. After dismissing certain claims before trial, the Superior Court conducted a non-jury trial on the claims of fraud and breach of contract, and entered final judgment in favor of the Sellers. On the com-

---

**2.** TMA is triethylamine—a raw material produced by DuCoa and used in choline chloride that was DCV, Inc.'s primary product.

mon law fraud claim, the trial court held that the evidence at trial established that no fraud had occurred, because: (1) the Sellers had fully disclosed all the known facts material to the TMA rebate to the Buyer; and (2) the Buyer failed to prove that it would not have proceeded with the transaction had it known that the TMA rebate was fraudulent. Therefore, the Buyer did not discharge its burden of proving fraud.

On the breach of contract claim, the Superior Court also found for the Sellers. The trial court concluded, based on extrinsic evidence, that the contracting parties intended that the Sellers would not be liable for any future liabilities or obligations that were unknown to the Sellers (specifically, to Messrs. Paul Halter of DuPont and Philip James of ConAgra) at the time of the closing. The Superior Court also determined that the Buyer's claim for indemnification for antitrust violation damages was governed by Section 3.13 of the Purchase Agreement, which provided that to the knowledge of the Sellers the companies being sold were not, and had not been, operated in violation of any applicable law. Because neither Mr. Halter nor Mr. James knew of any claimed antitrust violations at the time of the closing, the Superior Court determined that the Sellers were not contractually liable under the Purchase Agreement to indemnify the Buyer for damages arising from DuCoa's antitrust violations.

The facts, contentions, and analysis relevant to the fraud and the breach of contract claims, respectively, are next addressed.

### The Fraud Claim

The gist of the Buyer's fraud claim is that DuCoa booked a TMA rebate from DuPont that was fraudulent in nature and that had been accounted for in a manner contrary to General Accepted Accounting Principles ("GAAP"). The pertinent facts are as follows: In December 1996, DuCoa executive Pete Fischer requested a letter from DuPont's TMA business manager, John Leddy, that (falsely) confirmed a non-existent TMA rebate. The letter was supposedly intended to solve a one-time DuCoa accounting problem for the year 1996. Fischer promised Leddy that he would destroy the letter and would never book the rebate so that as a result, DuPont would never have to pay the rebate. Despite Fischer's promise, the rebate was entered on DuCoa's books as a receivable in 1996. The effect was to increase DuCoa's revenue for that year by $506,198, and to generate $404,000 in unearned performance-based bonuses for Fischer and other members of DuCoa's senior management.

During the negotiations for the sale of DCV, Inc., there were several inquiries into, and discussions about, the TMA rebate. During an investigation of the rebate, Tom Sikorski, the Buyer's primary negotiator, was informed by DuPont's Paul Halter (in a facsimile transmission) that: (1) the TMA Rebate had been booked by DuCoa in 1996 based on the Leddy letter; (2) in fact, the TMA rebate was never paid by DuPont in 1996; (3) as a result of booking the rebate on the basis of the rebate letter, DuCoa management had received additional incentive compensation; (4) DuCoa knew in March of 1997 that it would not receive the rebate from DuPont; and (5) DuCoa may have booked the false rebate intentionally to boost its executives' bonus compensation. Those same facts were later set forth, almost *verbatim,* in a Disclosure Schedule that was made part of the Purchase Agreement.

 This Court reviews the Superior Court's findings of fact to determine if they are supported by the record and are the product of a logical and orderly rea-

soning process.[3] Where the Superior Court's fact findings are based on the credibility of trial witness testimony, this Court will uphold those findings.[4]

■ The Buyer claims that the Superior Court rejected its fraud claim based on factual findings that lack support in the record. To prevail on its claim of common law fraud, the Buyer was required to show that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[5]

On appeal, the Buyer challenges two factual findings that relate to the first and fourth elements of its fraud claim. Those findings are that: (1) written communications by Buyer's representative adequately disclosed to the Buyer the false nature of the TMA rebate before the closing; and (2) the Buyer failed to show it would never have closed the deal had it known of the fraud. Neither challenge has merit.

The Superior Court found that adequate disclosure had been made to the Buyer of the false nature of the rebate, because all material facts known to the Sellers were disclosed both in the faxes to the Buyer's negotiator (Sikorski) and in the Disclosure Schedule. The Buyer contends, however, that (i) the Sellers withheld from the Buyer their knowledge that the rebate was fraudulent, and that (ii) the information included in the Disclosure Schedule and in the faxes was inadequate to alert the Sellers to the falsity of the rebate.[6] The Superior Court found otherwise, and the record supports its findings.

■ The evidence shows that the Sellers did not know the rebate was fraudulent and that they fully believed that the Leddy letter created a legally binding obligation, regardless of whether the rebate was booked in accordance with GAAP. The Buyer urges that the testimony of witnesses James and Porta established that Halter and James (agents of the Sellers) knew of the bogus nature of the rebate. That is not correct. Halter testified only that (i) he knew that it is contrary to GAAP to book income from a rebate that there is no obligation to pay; (ii) he believed that DuPont was legally obligated to pay the rebate; and (iii) he did not know the rebate was bogus. It was for the Superior Court, as the finder of fact, to determine the credibility of each witness and decide how much weight to afford their testimony. On this point, the Superior Court may have found Halter to be more credible than Porta or James, and any such finding is entitled to deference.

■ The record also supports the Superior Court's finding that the negotiation documents put the Buyer on notice of the false nature of the rebate. The Sellers

---

3. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

4. *Barks v. Herzberg*, 206 A.2d 507, 508 (Del. 1965).

5. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983).

6. Important to the analysis is that the one person who actually *knew* that the rebate was fraudulent, besides Fischer and Leddy, was Earnest Porta, an executive of the Buyer. Porta was told by Leddy that the rebate was bogus, but at trial Porta could not specify whether he discussed that conversation with Sikorski. That evidence undercuts the Buyer's argument that it was inadequately informed by the Sellers' disclosures of the fraudulent nature of the rebate.

represented in the Agreement that the financial statements were prepared in accordance with GAAP and that they fairly represented the financial position of DCV and its subsidiaries. The TMA rebate is listed in the Disclosure Schedule as an exception to that representation. Also, the faxes to Sikorski from the Sellers plainly disclosed that DuPont had refused to pay the rebate, and that the DuCoa earnings and incentive bonuses would have been lower were it not for the rebate entry on DuCoa's books. The record is, therefore, amply sufficient to support the Superior Court's factual finding that the false nature of the TMA rebate was adequately disclosed to the Buyer before the closing.

■ The Buyer next challenges the Superior Court's factual finding that the Buyer had failed to show it would not have closed the deal if it had known that the rebate was fictitious. Although the Buyer's witnesses did testify that the Buyer would not have completed the sale if it had known it was dealing with criminals, the Superior Court did not credit those assertions. The Superior Court found instead that the sale would have gone forward—as in fact it did.

The record shows that after the Buyer discovered the accounting irregularities, including the TMA rebate, the Buyer decided against requiring a reaudit of the records. Instead, the Buyer demanded (and received) a $4 million dollar reduction in the purchase price. On appeal, the Buyer argues that that price reduction was based on an earnings shortfall in 1997, not the TMA rebate issue, and that the Superior Court relied improperly on Sikorski's testimony that the Buyer had decided to seek a price reduction, rather than a reaudit, to remedy the TMA rebate and other accounting irregularities. The record, however, supports the Superior Court's opposite conclusion.

The Buyer's agent, Sikorski, testified that he knew (from Halter's faxes) that DuCoa senior management had received bonuses that they would not have enjoyed had the rebate not been improperly booked. Sikorski also testified that after his discussion with Halter about the DuCoa accounting practices and the TMA rebate, the Buyer decided to forego a reaudit and seek a price reduction instead. Although Sikorski did not specify the precise accounting issue on which that decision was based, it was reasonable for the Superior Court to infer that Sikorski and the Buyer's representatives, as experienced professionals, understood the ramifications of the TMA rebate facts and made a tactical decision to use the rebate issue (along with other issues) as leverage to obtain a price reduction.

Thus, the record, although extensive and even though at some points contradictory, supports the Superior Court's findings of fact and its legal conclusion that the Buyer failed to prove the elements of its common law fraud claim.

### The Contract Claim

The Buyer's breach of contract claim centers on the draft language of the "Representations and Warranties of the Sellers" in the Purchase Agreement. In the first draft, the Buyer sought "full and absolute protection" from the representations and warranties to be given by the Sellers. The Sellers refused to give such protection because (i) they had not been involved in the day-to-day operations of DCV, Inc. and its subsidiaries, (ii) they had given the Buyer full access to the employees and financial records of the businesses, and (iii) they did not want to be liable for potential liabilities of which they had no knowledge.

Accordingly, the Sellers' counsel redrafted the Purchase Agreement to include

"knowledge qualifiers" in several sections, and also to define the term "knowledge of the sellers" to mean the knowledge of Messrs. James and Halter. As a result, modifications were proposed to the three provisions at issue on this appeal (Sections 3.13, 3.9, and 3.25), and the Buyer agreed to each modification.

The Sellers added, and the Buyer agreed to, a "knowledge qualifier" to Section 3.13 (Compliance with the Law),[7] and to Section 3.25 (Full Disclosure of the Purchase Agreement).[8] Also relevant to this claim is Section 3.9 (No Undisclosed Liabilities), which originally stated:

> Except as set forth in Section 3.9 of the Disclosure Schedule, none of the Companies has any liabilities or obligations of any nature (whether absolute, accrued, contingent, unasserted, determined, determinable or otherwise) and *there is no existing condition or situation which could be reasonably expected to result in any such liabilities or obligations*, except.... (italics added.)

The Sellers would not accept the "existing condition" clause of Section 3.9 and requested its removal. The Buyer agreed to that request. The Sellers explained to the Buyer that they would reject any language that could make them responsible for liabilities that might arise after—and of which they were unaware at the time of—the completion of the sale.

■■ This Court will uphold the Superior Court's findings of fact regarding the parties' contractual intent that are sup-

ported by the record and are the product of a logical and orderly reasoning process.[9] We review the Superior Court's application of law to its factual and credibility determinations *de novo*.[10]

The Buyer advances two arguments on appeal relating to its (dismissed) breach of contract claim. First, the Buyer argues that there is no record support for the Superior Court's finding that the parties intended for the Sellers to be responsible only for liabilities that were known at the time of sale. Second, the Buyer argues that the Superior Court erred as a matter of law in determining that Section 3.13 governed the indemnification claim. Neither of these contentions has merit either.

■ The Buyer argues that the parties intended for Section 3.9 to cover *any* future or potential liabilities, emphasizing that the Sellers never asked that a knowledge qualifier be included in Section 3.9. The Buyer also points out that the Sellers had the opportunity to limit Section 3.9 during their negotiations over Section 3.27—a provision that carves out exceptions to the Sellers' representations and warranties. Undisclosed and unknown liabilities were not included among those exceptions. The Superior Court found, however, that the parties intended that the Buyer would bear the risk of loss from unknown and undisclosed liabilities, and the record supports that finding.

The trial testimony relating to the Section 3.9 negotiations and to the Buyer's agreement to remove that Section's "exist-

---

7. The final version of Section 3.13 read: "To the Knowledge of the Sellers, the Business is not being and has not been Conducted, and none of the Companies has been, or is in violation of any applicable Law, except for violations which in the aggregate would not have a Material Adverse Effect."

8. Section 3.25 ultimately stated: "To the Sellers' Knowledge, the representations and warranties of the Sellers in this Agreement do not

contain any untrue statement of material fact or fails to state any material fact necessary to make the statements contained therein not materially false or misleading in light of the circumstances in which made."

9. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

10. *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999).

ing condition" clause firmly establishes the contracting parties' intent. Specifically, throughout the negotiations of the Purchase Agreement, the Sellers consistently refused to agree to language that would require them to indemnify the Buyer from then-unknown liabilities that might arise after the closing of the sale. Also, as the Superior Court found, there was no evidence that the parties intended for the more general provision of Section 3.9 to override the more specific provisions that contained a knowledge qualifier. The Sellers' trial witnesses testified that they were never told of the Buyer's supposed belief that Section 3.9 was intended to trump other representations and warranties, or to cover unknown violations of the law. Thus, the record amply supports the Superior Court's factual finding that the parties did not intend for the Sellers to be liable for damages from violations arising after, and that were unknown to the Sellers at the time of, the closing.

As for the Buyer's second claim of error, the Superior Court determined that Section 3.13 governed the Buyer's claim for indemnification of liability resulting from the antitrust violations. The trial judge held that "where there is both a general and a specific provision that pertains to the same subject, courts ordinarily qualify the meaning of the general provision according to the meaning of the more specific provision." [11] Because Section 3.13 was the more specific of the two provisions, and contained a knowledge qualifier specifically limiting the Sellers' indemnification liability to violations of the law that were known by Messrs. Halter and James, Section 3.13 governed the indemnification claim. The Superior Court also held that Section 3.13 should govern, because if Section 3.9 were read to trump all other sections, then the knowledge qualifier in Section 3.13 would be rendered meaningless.

Well-settled rules of contract construction require that a contract be construed as a whole, giving effect to the parties' intentions. [12] Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one. [13]

The Buyer claims that the Superior Court erred as a matter of law in concluding that the more specific provision of Section 3.13 of the Purchase Agreement prevails over the more general Section 3.9 and governs the Buyer's indemnification claim. The Buyer argues that the Superior Court misapplied the rules of contract interpretation, [14] because Sections 3.13 and

---

**11.** *DCV Holdings, Inc. v. ConAgra, Inc.*, No. 98C–06–301, 2005 WL 698133, at *12 (Del.Super.Ct. Mar.24, 2005).

**12.** *Northwestern Nat'l Ins. v. Esmark*, 672 A.2d 41, 43 (Del.1996).

**13.** *Katell v. Morgan Stanley Group, Inc.*, No. 12343, 1993 WL 205033, at *4, 1993 Del. Ch. LEXIS 92, at *12 (Del. Ch. June 8, 1993). *See also Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del.1992) *citing Stasch v. Underwater Works, Inc.*, 158 A.2d 809, 812 (Del.Super.Ct.1960).

**14.** The Buyer argues that the case law and secondary authorities support the interpretation that Section 3.9 governs all undisclosed and unknown liabilities. The Buyer cites to a book by James Freund on acquisition agreements for the proposition that Section 3.9 (the Sellers representation that there were no liabilities as of the date of the contract) holds the Sellers liable for any unasserted liabilities whether or not the Seller knows of those liabilities. *See* James Freund, Anatomy of a Merger: Strategies and Techniques for Negotiating Corporate Acquisitions 262 (1975). The Sellers argue that Mr. Freund's book cannot be relied on as persuasive authority, because case law precludes Delaware courts from relying on books or treatises that are not introduced into evidence. Appellee DuPont Ans. Br. at 34. However, the cases the Sellers cite stand for the proposition that courts cannot rely on *medical* books not placed into evidence. As the Buyer correctly notes, Mr.

3.9 were not in conflict, and because the Superior Court's conclusion runs counter to the plain language of the Purchase Agreement. The Buyer contends that under principles of contract law, Section 3.9 must govern because the antitrust violations, even though unasserted, and unknown to the Sellers, had accrued by the time of the sale, and because the Sellers did not limit their liability under Section 3.9 to violations of law that were known to them.

We disagree. Section 3.13 states that to the knowledge of the Sellers, the company was not being, and had not been, operated in violation of the law. Section 3.9 is worded more broadly: it states that none of the IOCs had any liabilities or obligations of any nature (whether absolute, accrued, contingent, unasserted, determined, determinable, or otherwise). The more specific Section 3.13, which limits that section's scope to violations of the law that were known to the Sellers, is the narrower of the two provisions.

The Superior Court did not err in holding that Sections 3.13 and 3.9 were in conflict. If Section 3.9 governed, the Sellers would be liable to indemnify the Buyer for unknown violations of the law, contrary to the knowledge qualifier in Section 3.13—a result that would render that qualifier meaningless. The Superior Court's interpretation also gives effect to the adjudicated intent of the contracting parties, by allocating to the Buyer the risk of any unknown and undisclosed liabilities that might arise after the completion of the sale. Therefore, the Superior Court concluded correctly that Section 3.13 governed the indemnification claim for antitrust liabilities, and that such indemnification was not available to the Buyer under the Purchase Agreement.

*Freund's book has been relied on by this Court and the Court of Chancery as second-*

### *Conclusion*

Because the record supports the Superior Court's findings of fact, and the Superior Court did not err in its conclusions of law, the judgment of the Superior Court is affirmed.

*ary persuasive authority on several occasions.*