# IN THE SUPERIOR OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JON PEARCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. N23C-09-005 |
| v. | ) | SKR CCLD |
| | ) | |
| NEUEHEALTH, INC. (f/k/a BRIGHT HEALTH GROUP, INC.), | ) ) | |
| | ) | |
| Defendant. | ) | |

Submitted: April 29, 2024
Decided: July 15, 2024

*Upon Defendant's Motion to Dismiss,*
**GRANTED in part, DENIED in part.**

*Upon Defendant's Motion to Strike,*
**GRANTED.**

## <u>MEMORANDUM OPINION AND ORDER</u>

Carmella P. Keener, Esquire, Cooch and Taylor, P.A., Wilmington, Delaware, David W. Asp, Esquire, Joseph C. Bourne, Esquire, and R. David Hahn, Esquire, Lockridge Grindal Nauen P.L.L.P., Minneapolis, Minnesota, Anne T. Regan, Esquire, and Nathan D. Prosser, Esquire, Hellmuth & Johnson PLLC, Edina, Minnesota, Attorneys for Plaintiffs.

Emily V. Burton, Esquire, and Cheol W. Park, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Jan M. Conlin, Esquire, Heather M. McElroy, Esquire, and Patrick A. Cochran, Esquire, Ciresi Conlin LLP, Minneapolis, Minnesota, Attorneys for Defendant.

**RENNIE, J.**

# I.  INTRODUCTION

This controversy arises out of the allegedly fraudulent sale of Zipnosis, Inc. ("Zipnosis").  Plaintiffs—the sellers—claim that Defendant—the buyer—dishonestly presented itself as a functioning enterprise that was only growing stronger.  In reliance on that concept, Plaintiffs agreed to sell Zipnosis for a purchase price primarily comprised of stock in Defendant shortly before Defendant planned to go public.  The deal was not as good as Plaintiffs hoped.  Instead, Plaintiffs learned post-closing that severe operational deficiencies mired Defendant's business, straining Defendant's finances and embroiling Defendant in regulatory violations.  As a result, the stock Plaintiffs received in exchange for Zipnosis became virtually worthless less than three years after the sale.

Plaintiffs' primary claims sound in fraud.  Unencumbered by an anti-reliance clause, Plaintiffs cite numerous statements and omissions from the due diligence process to support their fraud claims.  The Court suspects that many, if not most, of those statements will not ultimately be actionable.  That is a question for another day, however.  For purposes of whether Plaintiffs have stated a reasonably conceivable fraud claim, the Court is satisfied that—giving Plaintiffs the benefit of every reasonable inference—at least one of Plaintiffs allegations could conceivably end in liability.  That is enough for now; so Plaintiffs' fraud claims withstand the motion.

Plaintiffs also bring a breach-of-contract claim, which must be dismissed. Plaintiffs acknowledge that—by operation of a survival period—they only had one year from closing to bring a claim for a breached representation. They did not do so. Instead, Plaintiffs ask the Court to apply fraud-based tolling. That will not work in this case because it is apparent from the face of the pleadings that reasonable diligence would have alerted Plaintiffs to their claim long before they filed suit. Because inquiry notice stops any tolling, Plaintiffs' contractual claim is untimely and must be dismissed.

Finally, Defendant urges the Court to enforce the jury waiver provisions found in the operative documents and strike Plaintiffs' request for a jury trial. The Court will do so. In brief, Plaintiffs argue that their preferred[1] jury waiver provision does not apply to pre-closing fraud. Contrary to Plaintiffs' argument, though, the fraud was not complete until Plaintiffs detrimentally acted in reliance on the alleged misrepresentations by executing the at-issue contract. Therefore, Plaintiffs' fraud claims arose out of the relevant agreement and the jury waiver unambiguously applies to those claims.

---

[1] As explained in the relevant section, two different jury waivers arguably could apply. Plaintiffs seek application of the narrower provision.

## II. FACTUAL BACKGROUND[2]

### A. The Parties

Plaintiffs are Jon Pearce, Ben Bowman, Mark Wagner, and Lisa Ide.[3] Each Plaintiff is a resident of Minnesota and a former officer or director of Zipnosis.[4]

Defendant NeueHealth, Inc. (f/k/a Bright Health Group, Inc.) is a Delaware corporation headquartered in Minnesota.[5]

### B. Negotiation of the Merger

Defendant is a healthcare company that both assists healthcare providers with its proprietary technology and operates a "healthcare financing and distribution platform."[6] When the COVID-19 pandemic surged, Defendant's business rapidly grew, fueled in part by the nation's exacerbated healthcare needs and a "special enrollment period" offered by government-run health insurance marketplaces.[7]

---

[2] The following facts are derived from the allegations in the Amended Complaint and are presumed to be true solely for purposes of this Motion. *See* D.I. No. 20 (hereinafter "Am. Compl.").

[3] *Id.* ¶¶ 12-15.

[4] *Id.*

[5] *Id.* ¶ 16. The Court notes that Defendant was still known as Bright Health Group, Inc. when Plaintiffs initiated this action. Defendant alerted the Court to its name change in February 2024. *See* D.I. No. 31. The Court reiterates that the facts in this section are taken from the Amended Complaint and, in addition to only being allegations, may be outdated in some respects.

[6] *Id.* ¶¶ 34-35.

[7] *Id.* ¶¶ 22, 39.

During this span, Defendant decided to plan an initial public offering ("IPO") scheduled for June 2021.[8]

Zipnosis is an "industry-leading platform for virtual healthcare services."[9] Like Defendant, Zipnosis's business boomed as the COVID-19 pandemic created a dire need for contactless healthcare services.[10] Zipnosis sought to build on that growth so, in July 2020, it retained "Cain Brothers" to advise it in connection with a potential merger or acquisition.[11] Defendant, hoping to augment its repertoire before its IPO, emerged as a potential buyer.[12]

In August 2020, as negotiations between Defendant and Zipnosis were underway, Defendant's CEO, G. Mike Mikan, explained that Defendant "had developed an aligned model for health care financing and delivery that—unlike other, existing models in the market—would allow [Defendant] to control costs and create shared value with providers as it scaled its operations."[13] Mikan also stated that Defendant was prepared to purchase Zipnosis for $140 million in cash.[14] In an October 2020 presentation that Cain Brothers made to Zipnosis, Defendant allegedly

---

[8] *Id.* ¶ 40.

[9] *Id.* ¶ 42.

[10] *Id.* ¶ 44.

[11] *Id.* ¶ 45.

[12] *Id.* ¶ 46.

[13] *Id.* ¶ 47.

[14] *Id.* ¶ 48.

represented "through Cain Brothers" that Defendant's "financial profile demonstrates strong fundamentals."[15]

Defendant also gave Cain Brothers a chart in "early 2021" that showed Defendant's medical cost ratio ("MCR")[16] for 2020 and its MCR projections for 2021.[17] The chart, which was reportedly based on "actual claims data," showed Defendant's actual 2020 MCR and its expected 2021 MCR remaining between 69.2% and 90.6%, except for a spike to 107% in the fourth quarter of 2020.[18] Defendant claimed the spike was attributable to "one-time, market-specific circumstances."[19]

Despite those promising representations, Defendant allegedly opposed a fulsome reverse due diligence process. Indeed, Plaintiffs claim that Defendant "approached due diligence" in a "secretive manner."[20] And Defendant "repeatedly refused to provide Zipnosis with information underlying [Defendant's] financial expectations—particularly those relating to costs associated with expected

---

[15] *Id.* ¶ 52.

[16] MCR measures what percentage of collected premiums an insurer spends on medical costs. *Id.* ¶¶ 23-26. Essentially, MCR reflects an insurer's profitability, and a lower MCR means higher profits. *Id.* An insurer whose MCR is over 100% is running a deficit.

[17] *Id.* ¶¶ 57-59.

[18] *Id.*

[19] *Id.* ¶ 58.

[20] *Id.* ¶ 57.

claims."[21] At the time, Defendant blamed the "pre-IPO process" for its financial bashfulness.[22] Defendant also used the pending IPO to "create a sense of urgency around the . . . transaction."[23] "Thus, Zipnosis's shareholders were in a position where [Defendant] was pushing for the transaction to close with minimal reverse diligence, and urg[ing] Plaintiffs to accept [Defendant's] statements about the company's MCR with little to no underlying data."[24]

The lack of in-depth reverse due diligence might not have affected Plaintiffs if Defendant had bought Zipnosis for cash as originally contemplated. But, in "early 2021," one of Defendant's executives told Zipnosis that while Defendant still had "plenty of cash available . . . it needed to keep cash in reserves to meet the requirements of state regulators."[25] So, Defendant "urge[d]" Zipnosis's shareholders to accept Series E stock in Defendant in lieu of cash.[26] Plaintiffs obliged.[27]

---

[21] *Id.* ¶ 60.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* ¶¶ 54-55.

[26] *Id.*

[27] *Id.* ¶ 61.

## C. The Merger Agreement

On March 8, 2021, Defendant, Zipnosis, and certain transactional parties that are not implicated here executed the Merger Agreement.[28]  Through the merger, Defendant acquired Zipnosis for a purchase price that consisted of 15% cash and 85% Series E stock in Defendant.[29]  The Series E stock was valued at a premium price of $28.07.[30]  The Merger Agreement primarily governed the transaction, but Plaintiffs also signed separate Stock Purchase Agreements (the "SPAs") that governed the transfer of the Series E stock.[31]

Article III of the Merger Agreement contained Defendant's express representations.  Relevant here, Section 3.4 stated:

> Since January 1, 2018, neither [Defendant] nor any Subsidiary of [Defendant] has received any written notice of any claimed violation of any Laws by [Defendant], any Merger Subsidiary or any other Subsidiary of [Defendant] that would reasonably be likely to, individually or in the aggregate, prevent, materially impede or materially delay the consummation of any of the transactions contemplated hereby (including the Merger).  [Defendant] and each Subsidiary of [Defendant] has been operated since January 1, 2018 in compliance with all applicable Laws, except for such non-compliance as would not reasonably be likely to, individually or in the aggregate,

---

[28]  *See* D.I. No. 25 (hereinafter "Def.'s Mot. to Dismiss"), Ex. 1 (hereinafter "Merger Agreement").

[29]  Am. Compl. ¶ 61; *see also* Merger Agreement.

[30]  Am. Compl. ¶ 61.

[31]  *See* Def.'s Mot. to Dismiss, Exs. 2-5 (hereinafter "SPA").  The four documents are the same except for the respective signatory.  The form Stock Purchase Agreement was attached to the Merger Agreement as Exhibit D.

prevent, materially impede or materially delay the consummation of any of the transactions contemplated hereby (including the Merger).[32]

The Merger Agreement did not contain an anti-reliance provision. It did, however, limit the survival period of Article III's representations to one year after closing.[33]

## D. Revelation of the Alleged Fraud

After executing the merger, Plaintiffs learned that Defendant's financial health and operational capabilities were not as strong as they thought. Instead, Defendant had been "plagued by systemic operational deficiencies that eventually led to a massive backlog of claims."[34] In essence, Defendant had more pending claims than it could process, so it allegedly resorted to improper and ineffective methods to try to clear the backlog.[35] Plaintiffs offer the colorful analogy of a General Mills executive "hand-form[ing] and bak[ing] each Cheerio" to describe Defendant's process for manually "flushing" claims.[36] That strategy did not work. Instead, Plaintiffs contend that Defendant simply hoped that it could "keep the plates spinning long enough" that "its problems would go away."[37]

---

[32] Merger Agreement § 3.4

[33] *Id.* § 6.1(a).

[34] Am. Compl. ¶ 63.

[35] *Id.* ¶ 72.

[36] *Id.*

[37] *Id.*

Defendant's haste to purge claims caused cascading issues. For one, Defendant allegedly did not keep track of how much it was paying out on claims, which prevented it from accurately calculating its MCR.[38] Defendant also allegedly made erroneous payments, needlessly increasing its costs.[39] The problems only got worse as the pandemic and the special enrollment period created yet more claims for Defendant to process.[40]

Defendant's alleged woes compounded after the June 2021 IPO because Defendant "was finally, gradually forced to account for claims it had previously ignored."[41] Accordingly, from the first to fourth quarters of 2021, Defendant's reported MCR grew from a modest 79.5% to an unsustainable 134.1%.[42] In November 2021, Defendant reported a net loss of almost $300 million for the third quarter of 2021.[43] By the end of 2021, Defendant's total net loss for the year was approximately $1.2 billion.[44]

The fallout from Defendant's alleged misconduct was not limited to financial strains. An investigation by the Nebraska Department of Insurance (the "NDI"),

---

[38] *Id.* ¶ 73.

[39] *Id.*

[40] *Id.* ¶ 75.

[41] *Id.* ¶ 80.

[42] *Id.*

[43] *Id.* ¶ 82.

[44] *Id.* ¶ 84.

which was dated February 2022 but not made public until November 2023, found that Defendant "mishandled thousands of claims and committed thousands of violations of state law."[45] The NDI concluded that the error rate of Defendant's claim denials suggested a "conscious and flagrant disregard of the law."[46] As a result of the NDI's investigation, Defendant entered a consent order through which Defendant acknowledged that it had violated Nebraska law, paid a $1 million penalty, and surrendered its ability to operate as an insurer in Nebraska.[47] The Colorado Division of Insurance released a similar report, accompanied by similar sanctions, in April 2022.[48]

Additionally, because Defendant went public shortly before its internal problems came to light, Plaintiffs are not the only unhappy shareholders. In January 2022, another investor filed a federal securities fraud class action against Defendant.[49] All of these developments negatively impacted Defendant's stock price. By December 2023, the shares Plaintiffs had bought for $28.07 in March 2021 were worth about $0.08.[50]

---

[45] *Id.* ¶ 64.

[46] *Id.* ¶ 66.

[47] *Id.* ¶ 69.

[48] *Id.* ¶ 70.

[49] *Id.* ¶ 83.

[50] *Id.* ¶ 87. In May 2023, Defendant executed a 1-to-80 reverse stock split to avoid being delisted from the New York Stock Exchange. *Id.* The $0.08 value is what the shares would be worth without the reverse split. *Id.*

## E. Procedural History

Following an unsuccessful litigation in Minnesota, Plaintiffs filed their Complaint in this Court on September 1, 2023.[51] Defendant moved to dismiss the initial Complaint,[52] so Plaintiffs filed an Amended Complaint on December 20, 2023.[53] The Amended Complaint states three causes of action: common-law fraud (Count I);[54] securities fraud under the Minnesota Securities Act ("MSA") (Count II);[55] and breach of the Merger Agreement (Count III).[56] Defendant moved to dismiss the entire Amended Complaint.[57] Defendant also moved to strike Plaintiffs' jury demand.[58] Plaintiffs opposed the Motion to Dismiss on February 22, 2024[59] and the Motion to Strike on February 28, 2024.[60] Defendant filed a reply brief supporting its Motion to Dismiss on March 15, 2024.[61] The Court heard argument on both motions on April 29, 2024.[62]

---

[51] D.I. No. 1.

[52] D.I. No. 14.

[53] Am. Compl.

[54] *Id.* ¶¶ 99-106.

[55] *Id.* ¶¶ 107-15.

[56] *Id.* ¶¶ 116-22.

[57] Def.'s Mot. to Dismiss.

[58] D.I. No. 33 (hereinafter "Def.'s Mot. to Strike").

[59] D.I. No. 36 (hereinafter "Pls.' Opp'n to Mot. to Dismiss").

[60] D.I. No. 38 (hereinafter "Pls.' Opp'n to Mot. to Strike").

[61] D.I. No. 39 (hereinafter "Def.'s Reply").

[62] D.I. No. 43.

## III.  STANDARD OF REVIEW

When reviewing a motion to dismiss under Superior Court Civil Rule 12(b)(6), the Court (1) accepts all well-pled factual allegations as true, (2) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (3) draws all reasonable inferences in favor of the non-moving party, and (4) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[63]  The Court will not, however, accept "conclusory allegations that lack specific supporting factual allegations."[64]  "The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, demonstrate that the claims are untimely."[65]

Rule 12(f) permits the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[66]  On such a motion, the Court examines "whether the challenged allegation is relevant to an issue in the case, and if it is unduly prejudicial."[67]  "Motions to

---

[63]  *See ET Aggregator, LLC v. PFJE AssetCo Hldgs. LLC*, 2023 WL 8535181, at *6 (Del. Super. Ct. Dec. 8, 2023).

[64]  *Id.* (quoting *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[65]  *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005) (footnotes and citations omitted).

[66]  Super. Ct. Civ. R. 12(f).

[67]  *Heisenberg Principals Fund IV, LLC v. Bellrock Intel., Inc.*, 2018 WL 3460433, at *1 (Del. Super. Ct. July 17, 2018) (ORDER) (citations omitted).

strike 'are granted sparingly, and then only if clearly warranted, with doubt being resolved in favor of the pleading.'"[68]  "Where a party effectively waives its right to trial by jury in a contract, the Court may, upon motion, strike the party's demand for a jury trial from the pleading."[69]

## IV. PARTIES' CONTENTIONS

### A. Defendant's Contentions

To defeat Plaintiffs' fraud claims, Defendant primarily argues that the allegedly fraudulent statements were not actionable misrepresentations. For example, Defendant claims that all MCR forecasts are inherently imprecise, so insurers cannot be liable for getting them wrong.[70] Defendant also suggests that its sales-pitch statements, such as the comments about its "strong fundamentals" and an "aligned model for health care financing," were nothing more than puffery.[71] Defendant makes similar arguments for all of the allegedly false statements, generally characterizing Plaintiffs' claims as "fraud-by-hindsight."[72] Defendant also argues that in this arm's-length transaction, Defendant owed no duty to volunteer

---

[68]  *Id.* (quoting *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 661 (Del. Super. Ct. 1985)).

[69]  *The Data Ctrs., LLC v. 1743 Hldgs. LLC*, 2015 WL 6662107, at *4 (Del. Super. Ct. Oct. 27, 2015) (citing *Wilm. Tr. Co. v. Renner's Paving, LLC*, 2013 WL 1442366 (Del. Super. Ct. Mar. 27, 2013)).

[70]  Def.'s Mot. to Dismiss at 11-14.

[71]  *Id.* at 16-18.

[72]  *Id.* at 14-23.

unflattering facts, such as complaints submitted to state regulators or ongoing operational deficiencies.[73]

Turning to Plaintiffs' breach-of-contract claim, Defendant first argues that its admitted violations of state law did not render Section 3.4 of the Merger Agreement false because those violations did not prevent or delay consummation of the merger.[74] Defendant then argues that even if Section 3.4 was false, Plaintiffs' claim is untimely because it was brought outside of the applicable one-year survival period.[75]

Defendant separately moved to strike Plaintiffs' request for a jury trial.[76] Its argument is straightforward. Both the Merger Agreement and the SPAs signed by Plaintiffs contained broad jury-waiver provisions.[77] Defendant asks the Court to enforce those provisions and strike Plaintiffs' request for a jury.[78]

## B. Plaintiffs' Contentions

Plaintiffs deny Defendant's characterization of this case as fraud-by-hindsight or misplaced trust in vague salesmanship. To do so, Plaintiffs go through the extra-contractual representations made by Defendant during due diligence and attempt to

---

[73] *Id.* at 24-29.

[74] *Id.* at 29-30.

[75] *Id.* at 31-34.

[76] Def.'s Mot. to Strike.

[77] *Id.* at 2-3.

[78] *Id.* at 4-6.

highlight the kernels of then-present fact implicit in each statement.[79]  For example, Plaintiffs claim that Defendant's MCR-related representations "conveyed the false impression that Defendant understood its medical expense data, could present an accurate picture of its past and present MCR, and could make responsible (even if not perfect) predictions about its future MCR."[80]  Plaintiffs continue that Defendant's misleading affirmative representations, paired with Defendant's efforts to rush Plaintiffs through a superficial reverse due diligence process, made it incumbent on Defendant to disclose the true state of Defendant's operation.[81]

Plaintiffs next defend their breach-of-contract claim.  They say that whether Defendant's legal violations were "reasonably . . . likely to, individually or in the aggregate, prevent, materially impede or materially delay the consummation of any of the transactions contemplated [by the Merger Agreement]" is, at most, a "highly factual question" worthy of discovery.[82]  To excuse the untimeliness of their breach-of-contract claim, Plaintiffs invoke the doctrine of fraudulent concealment, arguing that Defendant's actions prevented Plaintiffs from bringing this claim within the contractually mandated period.[83]

---

[79]  Pls.' Opp'n to Mot. to Dismiss at 16-24.

[80]  *Id.* at 22.

[81]  *Id.* at 25-29.

[82]  *Id.* at 31-33.

[83]  *Id.* at 33-34.

Last, Plaintiffs ask the Court to maintain their jury demand with respect to their fraud claims, or at least defer striking it until after discovery.[84] Plaintiffs acknowledge that they waived a jury for their breach-of-contract claim, but say they did not do so for their fraud claims.[85] In Plaintiffs view, the SPAs—which contain a narrower jury-waiver provision than the Merger Agreement—govern the fraud claims.[86] Plaintiffs continue that their fraud claims do not fall under the jury-waiver provision in the SPAs because that provision only applies to disputes "arising out of" the SPAs.[87] Plaintiffs theorize that pre-contractual fraud claims cannot "arise[e] out of" the contract.[88]

## V. DISCUSSION

### A. Plaintiffs Have Stated a Viable Claim of Fraud.[89]

A common-law fraud claim consists of five elements: (1) a false representation; (2) the defendant's knowledge of the representation's falsity or

---

[84] Pls.' Opp'n to Mot. to Strike at 6.

[85] *Id.* at 1.

[86] *Id.* at 3-5.

[87] *Id.*

[88] *Id.*

[89] The parties agree that, as applicable here, statutory fraud under the MSA, *see* MINN. STAT. § 80A.76(b), is at least as broad of a cause of action as Delaware's common-law fraud. *See* Def.'s Mot. to Dismiss at 10-11; Pls.' Opp'n to Mot. to Dismiss at 12. Where the parties disagree is how much broader the MSA is compared to Delaware's common-law fraud. *Compare* Pls.' Opp'n to Mot. to Dismiss at 30-31 *with* Def.'s Reply at 2-4. Because the Court finds that Plaintiffs have pled a common-law fraud claim that suffices to escape the pleading stage, the Court need not reach the MSA-specific arguments presented by the parties.

reckless indifference to its truth; (3) the defendant's intent to induce action or inaction by the plaintiff; (4) the plaintiff's justifiable reliance on the false representation; and (5) the plaintiff being damaged by such reliance.[90] Additionally, Rule 9(b) requires "the circumstances of the fraud" to be pled with particularity.[91] The requirements for a securities fraud claim under the MSA are functionally the same for purposes of this opinion.[92]

Importantly here, the Court's role at the pleading stage is only to determine whether the plaintiff has brought a reasonably conceivable claim of fraud. The Court is not tasked with tailoring Plaintiffs' pleading to include only actionable statements.[93] That inures to Plaintiffs' benefit in this case.[94] At this point, it seems

---

[90] *See ABRY Partners V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. Feb. 14, 2006) (citing *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005)).

[91] *Id.*

[92] *See Robert Allen Taylor Co. v. United Credit Recovery, LLC*, 2016 WL 5640670, at *8 (Minn. Ct. App. Oct. 3, 2016); *see supra* note 89.

[93] *See, e.g.*, *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Ct. Jan. 26, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim."); *Envolve Pharmacy Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 855866, at *4 n.45 (Del. Super. Ct. Mar. 8, 2021) ("[I]t is not generally the Court's duty to dissect a single claim for either dismissal or rescues of its constituent theories of liability."); *ET Aggregator*, 2023 WL 8535181, at *7 ("The Court agrees with the reasoning set out in *inVentiv*—Civil Rule 12(b)(6) does not permit piecemeal dismissals of parts of a claim."); *Cablemaster LLC v. Magnuson Grp. Corp.*, 2023 WL 8678043, at *7 (Del. Super. Ct. Dec. 5, 2023) ("Once the Court determines the claim as a whole is sound, testing the strength of every individual girder is inessential.").

[94] *Cf. Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *24 n.214 (Del. Super. Ct. Aug. 16, 2021) (declining to consider a plaintiff's scantily pled "sub-theor[y]" based upon a "logical extension" of the whole-count rule discussed in *inVentiv*).

that much of Plaintiffs' Amended Complaint pertains to imprecise statements and predictions that will not ultimately support liability. But at this "plaintiff-friendly" juncture in the litigation,[95] there is at least one alleged misrepresentation that suffices to spare Counts I and II from an early dismissal.

The Court finds that, at this point, the inaccurate 2021 MCR projections Defendant provided to Plaintiffs could conceivably support fraud liability. As Defendant is quick to point out, "[g]enerally speaking, '[p]redictions about the future cannot give rise to actionable common law fraud.'"[96] But, "[a]n exception to that rule applies when plaintiffs can establish that the projections were 'unsound from the inception.'"[97] For a plaintiff to avail itself of that exception:

> What is necessary is the pleading of facts suggesting that the original estimates were fraudulently conceived, from the get-go. This does not require a plaintiff to probe the mindset of the defendants, what it does require is that the plaintiff set forth particularized facts regarding the precise estimates in question, the circumstances suggesting they were unsound from the inception, and why the defendants had an incentive to intentionally low-ball them.[98]

With respect to Defendant's 2021 MCR projections, Plaintiffs have pled just that.

---

[95] *CRE Niagara Hldgs., LLC v. Resorts Grp., Inc.*, 2021 WL 1292792, at *9 (Del. Super. Ct. Apr. 7, 2021) (quoting *Ladenburg Thalmann Fin. Servs., Inc. v. Ameriprise Fin., Inc.*, 2017 WL 685577, at *4 (Del. Super. Ct. Jan. 30, 2017)).

[96] *DG BF, LLC v. Ray*, 2021 WL 776742, at *23 (Del. Ch. Mar. 1, 2021) (second alteration in original) (quoting *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2021)).

[97] *Id.* (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006)).

[98] *Trenwick*, 906 A.2d at 209.

As alleged by Plaintiff, the fraudulent nature of Defendant's 2021 MCR projection is not that Defendant was unduly optimistic, imprecise, or shortsighted when preparing its forecast. Instead, Plaintiffs allege that the forecast was fraudulent because it was "an utter fabrication" bereft of any factual basis and only designed to make Defendant look like a business worth investing in.[99] In other words, if Plaintiffs' claims are true, Defendant's projection was not simply wrong in hindsight, it was unsound from the inception.

The Court notes that Plaintiffs' claims are not based on generic accusations of mismanagement or insufficient oversight. To the contrary, the Amended Complaint details the specific reason Defendant did not have the data necessary to legitimately project its MCR—namely, the slapdash claims-handling processes Defendant allegedly adopted in response to its unmanageable backlog of claims.[100] Moreover, Plaintiffs purport to corroborate their accusations by reference to state agency findings that indicate Defendant disregarded the internal controls that make it possible to process claims timely and correctly.[101]

The Court stresses that it is not the mere inaccuracy of the 2021 MCR projections that makes them conceivably fraudulent.[102] Instead, the reasonably

---

[99] *See* Am. Compl. ¶¶ 3, 62, 67, 72-73, 85.

[100] *See id.* ¶ 72.

[101] *Id.* ¶¶ 64-70.

[102] *See Trenwick*, 906 A.2d at 209.

conceivable fraud is Defendant allegedly pulling favorable MCR numbers from the void and passing them off as legitimate financial forecasts. Assuming that occurred, as the Court must, it was not mere puffery or an inherently fallible prediction—it was actionable deceit.[103]

Similarly, Defendant cannot hide behind the supposedly unique difficulty of using existing data to predict a future MCR because Plaintiffs' allegation is that Defendant did not even attempt to do so.[104] In other words, if Defendant did not have any factual basis to make its projection but represented that it did, it makes little difference that a well-founded projection might still have been wrong. Defendant will, of course, have the opportunity to dispel the inference that it simply made up its 2021 MCR projections to induce Plaintiffs into a lopsided deal; but, for now, Plaintiffs have pled enough to pursue their fraud claims.

## B. Plaintiffs' Breach-of-Contract Claim is Untimely.

Although Plaintiffs' fraud claims clear the low threshold of Rule 12(b)(6), their breach-of-contract claim does not. Instead, it is apparent from the face of the Amended Complaint that Plaintiffs' contract claim is untimely. In brief, Plaintiffs hope to avail themselves of tolling based upon fraudulent concealment despite

---

[103] *See DG BF, LLC*, 2021 WL 776742, at *23.

[104] Def.'s Mot. to Dismiss at 11-13.

pleading facts that demonstrate Defendant's alleged breach was not concealed for long. Therefore, Count III must be dismissed.

"Delaware courts have interpreted contractual provisions that limit the survival of representations and warranties as evidencing an intent to shorten the period of time in which a claim for breach of those representations and warranties may be brought, i.e., the statute of limitations."[105] Here, Plaintiffs do not attempt to argue that Merger Agreement Section 6.1(a) did not limit the survival period of the at-issue representation—Merger Agreement Section 3.4—to one year after closing.[106] Plaintiffs instead encourage the Court to put aside that time limitation because Defendant's fraud prevented Plaintiffs from bringing their claims on time.[107]

The doctrine of fraudulent concealment will toll the statute of limitations if the plaintiff "show[s] that the defendant knowingly acted to prevent [the] plaintiff from learning facts or otherwise made misrepresentations intended to put the plaintiff off the trail of inquiry."[108] But such tolling does not last forever. Instead, "[i]f fraudulent concealment occurs, then 'the statute is suspended only until [the

---

[105] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011) (collecting authority).

[106] Pls.' Opp'n to Mot. to Dismiss at 31-34.

[107] *Id.* at 33-34.

[108] *AssuredPartners of Va., LLC v. Sheehan*, 2020 WL 2789706, at *17 (Del. Super. Ct. May 29, 2020) (second alteration in original) (internal quotation marks omitted) (quoting *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 531 (Del. Ch. 2005)).

plaintiff's] rights are discovered or until they could have been discovered by the exercise of reasonable diligence.'"[109]

In this instance, even if fraudulent concealment applied at some point, any such tolling undoubtedly stopped more than a year before Plaintiffs filed this claim in September 2023. As Plaintiffs themselves allege, a federal securities fraud class action was filed against Defendant in January 2022 based on allegations similar to those in this case.[110] Plaintiffs continue that Defendant's "fraud was further revealed on March 2, 2022" when Defendant reported that it lost $813.4 million in the fourth quarter of 2021 with an MCR of 134.1% in that period.[111] And, most importantly, Plaintiffs plead that "[i]n a Final Agency Order released by the [Colorado] Division of Insurance in April 2022, [Defendant] acknowledged that it violated Colorado law and agreed to pay a $1 million fine."[112] In light of those pled facts, the Court is convinced that Plaintiffs were at least on inquiry notice of Defendant's alleged breach of Section 3.4 before September 2022.

---

[109] *Id.* (second alteration in original) (quoting *Pettinaro Enters.*, 870 A.2d at 531); *see also Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *15 (Del. Ch. Sept. 18, 2020) ("No theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007), *abrogated on other grounds by In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016))).

[110] Am. Compl. ¶ 83.

[111] *Id.* ¶ 84.

[112] *Id.* ¶ 70.

Plaintiffs resist that conclusion by citing to *Tyson Foods*.[113] There, the Court of Chancery concluded, "it would be inappropriate to infer that plaintiffs were on inquiry notice of injury simply because some relevant information was in the public domain."[114] That case is hardly analogous, though. In *Tyson Foods*, the defendants said that the plaintiffs should have, or at least could have, discovered an alleged scheme regarding the timing of stock-option grants by comparing the dates of the grants with publicly available news reports from those dates.[115] Unconvinced, the Court of Chancery held that "reasonable diligence" did not necessarily include "an obligation to sift through a proxy statement, on the one hand, and a year's worth of press clippings and other filings, on the other, in order to establish a pattern concealed by those whose duty is to guard the interests of the investor."[116]

In this case, Plaintiffs only had to look at the Colorado Division of Insurance's April 2022 order to find out about the alleged breach. Notably, *Tyson Foods* specifically mentioned the existence of a published report revealing the alleged wrongdoing as a means of establishing inquiry notice.[117] And even assuming—without deciding—that reasonable diligence would not ordinarily require Plaintiffs

---

[113] Pls.' Opp'n to Mot. to Dismiss at 34 (citing *Tyson Foods*, 919 A.2d at 591).

[114] *Tyson Foods*, 919 A.2d at 591.

[115] *Id.* at 590-91.

[116] *Id.* at 591.

[117] *Id.*

to review the April 2022 order, the January 2022 class-action lawsuit and March 2022 financial reports were conspicuous warning signs that should have prompted closer scrutiny into Defendant's activities.

As *Tyson Foods* observed, "investors are under an obligation to exercise reasonable diligence in their affairs, and no succor from the statute of limitations should be offered a dilatory plaintiff in the absence of such care."[118] The Court cannot conclude that Plaintiffs exercised such diligence by waiting until September 2023 to bring a breach-of-contract claim that was easily ascertainable no later than April 2022. That is especially true given the portents of misconduct available even earlier in 2022. Thus, the Court dismisses Count III as time barred.

## C. Plaintiffs Unambiguously Waived Their Right to a Jury.

In the final analysis, the Court will enforce the contractual jury waivers to which Plaintiffs assented and, therefore, strike Plaintiffs' jury request. Merger Agreement Section 9.6(c) contains a broad jury waiver provision that Plaintiffs do not attempt to argue would not cover Plaintiffs' fraud claims.[119] Plaintiffs instead argue that only the SPAs' more limited waiver applies.[120] Since the Court finds that

---

[118] *Id.* (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998)).

[119] *See* Pls.' Opp'n to Mot. to Strike.

[120] *Id.* at 2-4.

even the SPAs' waiver covers Plaintiffs' fraud claims, it need not decide whether the

Merger Agreement's broader waiver should apply instead.

The relevant portion of SPA[121] Section 8(b) reads:

THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE ARISING OUT OF THIS AGREEMENT, AND HEREBY ACKNOWLEDGE THAT ANY SUCH ACTION MAY BE TRIED BY A JUDGE SITTING WITHOUT A JURY.[122]

Accordingly, the pivotal issue is whether Plaintiffs' fraud claims unambiguously "aris[e] out of" the SPAs.[123] They do.

The thesis of Plaintiffs' argument in this regard is that pre-contractual fraud does not arise out of the contract.[124] In other words, Plaintiffs argue that because Defendant communicated the alleged misrepresentations before the parties executed the SPAs, the fraud could not arise out of the SPAs. The Court does not agree with that proposition.

---

[121] As noted, each of the Plaintiffs' respective SPAs are identical with the exception of the signature page. *See supra* note 31.

[122] SPA § 8(b).

[123] *See The Data Ctrs.*, 2015 WL 6662107, at *4 (holding that Delaware courts will enforce unambiguous jury waivers but will defer striking a jury request until after discovery if the waiver is ambiguous (citations omitted)).

[124] Pls.' Opp'n to Mot. to Strike at 1, 5-6.

To start, it has been established in the insurance context,[125] and applied elsewhere,[126] that the term "arising out of" is liberally construed to require only a "meaningful linkage."[127]  But even if the Court were to apply a more demanding but-for causation test, Plaintiffs' fraud claims would still arise out of the SPAs.  That is because Plaintiffs' theory only accounts for half of the elements of fraud.

Plaintiffs are correct that, as alleged, Defendant knowingly communicated misrepresentations with the intent to induce Plaintiffs' reliance thereon before the SPAs were executed.  But if that is all Plaintiffs could prove at trial, they would lose.  To prevail, Plaintiffs must also prove they justifiably acted in reliance on the misrepresentations to their detriment.[128]  For those equally necessary elements of fraud, Plaintiffs' acceptance of purportedly overvalued Series E stock through the SPAs will be a critical fact.

Indeed, Plaintiffs' Amended Complaint already acknowledges the importance of the stock transfer with respect to Plaintiffs' fraud claims.  In pleading Counts I and II, Plaintiffs state: "In reliance on [Defendant]'s representations concerning its financial health and the value of its stock, Plaintiffs . . . agreed to accept [Defendant]

---

[125] *See ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*, 305 A.3d 339, 347-48 (Del. 2023).

[126]  *See Leister v. Red Mud Enters. LLC*, 2023 WL 11196881, at *1 (Del. Ch. Apr. 26, 2024) (ORDER).

[127] *Guaranteed Rate*, 305 A.3d at 347.

[128] *See ABRY Partners*, 891 A.2d at 1050.

Series E stock in lieu of cash as a large part of the consideration for that transaction."[129] The Amended Complaint continues, "Plaintiffs were injured by their reliance on [Defendant]'s representations. Specifically, Plaintiffs received stock that was worth substantially less than the represented value."[130]

But for the execution of the SPAs, Plaintiffs could not make those critical allegations. Accordingly, the Court finds that Plaintiffs' claims about being defrauded into accepting overvalued stock arise out of the agreements that facilitated the transfer of said stock. For that reason, the SPAs' jury waiver unambiguously applies to Plaintiffs' fraud claims, so Plaintiffs' request for a jury trial is stricken.

## VI. CONCLUSION

Plaintiffs' common-law and statutory fraud claims are reasonably conceivable. Plaintiffs' breach-of-contract claim, however, is untimely. And Plaintiffs waived their right to a jury through the Stock Purchase Agreements. Hence, Defendant's Motion to Dismiss is **GRANTED in part, DENIED in part**; and Defendant's Motion to Strike is **GRANTED**.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[129] Am. Compl. ¶¶ 104, 112.

[130] _Id._ ¶ 106.

27